# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Corbin R. Davis

## ARBUCKLE v GENERAL MOTORS LLC

Docket No. 151277. Argued on application for leave to appeal May 4, 2016. Decided July 15, 2016.

Clifton M. Arbuckle sustained a work-related back injury while working for General Motors Corporation, now General Motors LLC (GM), and in May 1993 began receiving a disability pension. He retired that month and was subsequently awarded workers' compensation benefits relating to his disability. Later, he also received Social Security Disability Insurance (SSDI) benefits. GM and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) had executed a letter of agreement in 1990 in which GM agreed not to coordinate workers' compensation and disability pension benefits for its employees under MCL 418.354, which generally requires reduction of workers' compensation benefits by coordination with disability pension benefits. This letter of agreement was incorporated into the 1990 collective-bargaining agreement (CBA) between GM and the UAW and was intended to remain in place until termination or amendment of the CBA, which expired in November 1993. When the CBA expired, however, the provision against coordination was continued in subsequent letters of agreement and incorporated into subsequent CBAs. In 2009, GM and the UAW adopted a formula (incorporated into the 2009 CBA) by which GM would coordinate benefits, using disability pension benefits to reduce the amount of workers' compensation benefits for all workers and retirees, regardless of when they had retired. GM advised Arbuckle that effective January 1, 2010, his benefits would be reduced using the formula in the 2009 agreement. Arbuckle requested a hearing before the director of the Workers' Compensation Agency, who ultimately concluded that GM was improperly using Arbuckle's SSDI benefits to offset his workers' compensation benefits, in violation of MCL 418.354(11). A workers' compensation magistrate reversed the director's ruling but nevertheless concluded that GM was prohibited from reducing Arbuckle's workers' compensation benefits by his disability pension benefits because Arbuckle had never agreed to coordination of benefits and no evidence established that the UAW had the authority to bargain on Arbuckle's behalf after his retirement. The Michigan Compensation Appellate Commission (MCAC) reversed in part, holding that irrespective of the UAW's authority to bind retirees, GM was permitted to coordinate Arbuckle's disability pension benefits. Arbuckle sought leave to appeal, but after the Court of Appeals granted his application, he died. Robert Arbuckle, the personal representative of the estate, was substituted as plaintiff. The Court of Appeals, STEPHENS, P.J., and HOEKSTRA and METER, JJ., reversed in an unpublished opinion per curiam, issued February 10, 2015 (Docket No. 310611), and remanded the case for further proceedings. GM sought leave to appeal. In lieu of granting

leave to appeal, the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 498 Mich 956 (2015).

In a unanimous opinion by Justice LARSEN, the Supreme Court *held*:

GM may coordinate Arbuckle's disability pension benefits because the parties' collective-bargaining agreements and the subsequent modifications to them did not vest Arbuckle's right to uncoordinated benefits.

1. A threshold question was whether Arbuckle's claim of entitlement to uncoordinated workers' compensation benefits was actually a claim under § 301 of the Labor Management Relations Act, PL 80-101, § 301; 61 Stat 136, 156; 29 USC § 185(a), and therefore preempted by federal law. While § 301 gives federal courts jurisdiction over controversies involving CBAs, state courts have concurrent jurisdiction over them. Section 301, however, nonetheless preempts state substantive law. State courts must apply federal law in deciding those claims because only federal law governs the interpretation and application of CBAs. Accordingly, it was necessary to decide whether this case was properly characterized as a claim subject to the preemptive force of § 301. Preemption under § 301 occurs when a decision on the state claim is inextricably intertwined with consideration of the terms of the labor contract and when application of state law to a dispute requires the interpretation of a CBA. A two-part test is used to determine whether § 301 preemption applies. The court must first examine whether proof of the state-law claim requires interpretation of the terms of a CBA and, second, ascertain whether the right claimed by the plaintiff was created by the CBA or state law. If application of the test reveals a right that both arises from state law and does not require contract interpretation, there is no preemption, but if a state-law claim fails either of these two requirements, it is preempted by § 301.

2. Arbuckle framed his claim as enforcement of a right to workers' compensation benefits arising under the Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq*. The WDCA provides that an employer's obligation to pay weekly workers' compensation benefits must be reduced by other wage-replacement benefits. Therefore, the coordination of benefits is mandatory under the WDCA, subject to certain limitations. The relevant limitation in this case is found in MCL 418.354(14), which provides that mandatory coordination does not apply to any payments received or to be received under a disability pension plan provided by the same employer that was in existence on March 31, 1982. Any disability pension plan entered into or renewed after that date, however, may provide that payments will not be coordinated under MCL 418.354. Accordingly, benefits under disability pension plans begun or renewed after March 31, 1982, are subject to coordination by virtue of the statute, but an employer may elect against exercising its right to coordinate benefits, such as when it enters into an employment agreement exempting benefits from coordination. Determining whether GM was authorized to coordinate Arbuckle's workers' compensation benefits with his disability pension benefits required interpretation of the 1990 agreement and the 1990 CBA as well as the parties' subsequent agreements permitting benefit coordination, which were incorporated into the subsequent CBAs. Because resolution of the underlying coordination claim required the interpretation of a CBA, Arbuckle's claim failed the first prong of the preemption test and was, therefore, preempted by § 301.

3. The 2009 agreement, incorporated into the 2009 CBA, permitted coordination of those benefits for all retirees who retired before January 1, 2010, regardless of their date of retirement or injury, while the 1990 agreement, in effect when Arbuckle retired, did not permit coordination. Central to the determination of which agreement controlled was whether the 1990 agreement provided vested or nonvested benefits to Arbuckle. Under federal law, a union may represent and bargain for already-retired employees, but only with respect to nonvested benefits. By contrast, when an employer explicitly obligates itself to provide vested benefits, that promise is rendered forever unalterable without the retiree's consent. The intent of the parties and the specific language of the CBA at issue control whether a benefit vests, and a right to uncoordinated benefits that is subject to an express durational limit does not vest.

4. The Court of Appeals erred by holding that GM lacked the authority to coordinate Arbuckle's benefits under the 2009 CBA. The 1990 agreement extended uncoordinated benefits only until termination or earlier amendment of the 1990 CBA, which expired on November 15, 1993. Every subsequent agreement that likewise prohibited coordination included an express durational limitation like that contained in the 1990 agreement, representing GM's continued commitment to refrain from coordinating benefits only until termination or earlier amendment of each subsequent agreement. Under the terms of the 1990 agreement and the 1990 CBA, Arbuckle's right to uncoordinated benefits was subject to modification and thus was not a vested right. Nothing in the 1990 CBA itself, or the subsequent modifications of it, demonstrated a commitment by GM to provide Arbuckle an unalterable right to uncoordinated benefits that would survive termination of the agreement.

Reversed; MCAC's order reinstated.

©2016 State of Michigan

# OPINION

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen

FILED July 15, 2016

STATE OF MICHIGAN

SUPREME COURT

ROBERT ARBUCKLE, Personal
Representative of the Estate of CLIFTON M.
ARBUCKLE,

       Plaintiff-Appellee,

v                              No. 151277

GENERAL MOTORS LLC,

       Defendant-Appellant.

BEFORE THE ENTIRE BENCH

LARSEN, J.

In this case, we consider whether MCL 418.354 of the Worker's Disability Compensation Act (WDCA)[1] permits coordination of plaintiff's workers' compensation benefits with his disability pension benefits in light of postretirement changes made to plaintiff's pension plan as a result of collective bargaining. Applying federal substantive

---

[1] MCL 418.101 et seq.

law to the facts of this case, we hold that defendant may coordinate plaintiff's disability pension benefits because the parties' collective-bargaining agreements and the subsequent modifications thereto did not vest plaintiff's right to uncoordinated benefits.[2] We therefore reverse the judgment of the Court of Appeals and reinstate the order of the Michigan Compensation Appellate Commission, which allowed coordination.

## I. BASIC FACTS AND PROCEEDINGS

Plaintiff, Clifton Arbuckle,[3] began working for defendant, General Motors LLC, in July 1969; he retired in May 1993. On June 20, 1991, plaintiff sustained a work-related back injury and, effective May 1, 1993, began receiving a total and permanent disability pension from defendant. Following his retirement later that month, plaintiff filed a petition seeking workers' compensation benefits for his work-related disability. In February 1995, a magistrate found plaintiff partially disabled and granted him an open award of benefits at a fixed rate of $362.78 a week until further order of the Workers' Compensation Agency. Sometime after he began receiving workers' compensation benefits, plaintiff also began receiving Social Security Disability Insurance (SSDI) benefits.

After discovering that many employers were paying more than once to compensate a disabled employee's lost earning potential when that employee was also

---

[2] See *M&G Polymers USA, LLC v Tackett*, 574 US ___, ___; 135 S Ct 926, 937; 190 L Ed 2d 809 (2015).

[3] Because Robert Arbuckle is pursuing this appeal as personal representative of the estate of the late Clifton Arbuckle, who died during the appeal, "plaintiff" refers to Clifton Arbuckle.

receiving disability pension benefits, the Legislature, in 1981, enacted MCL 418.354.[4] The statute permits an employer to reduce its obligation to pay an employee's weekly workers' compensation benefits by coordinating those benefits with that employee's disability pension benefits. Although the statute makes coordination mandatory by default,[5] MCL 418.354(14) permits an employer to elect *not* to coordinate disability pension benefits in certain circumstances, such as when it negotiates an employment agreement that provides otherwise.

In this case, defendant and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)[6] executed a letter of agreement in 1990 (the 1990 Letter of Agreement), pursuant to which defendant agreed not to coordinate statutory workers' compensation benefits with contractual disability pension benefits for its employees. This letter of agreement was incorporated into the then-existing 1990 collective-bargaining agreement (CBA) between defendant and the UAW, constituting an amendment of the 1990 pension plan under which plaintiff would eventually retire. The 1990 Letter of Agreement provided that the prohibition against benefit coordination was to continue "until termination or earlier amendment of the 1990 Collective Bargaining Agreement," which expired on November 15, 1993.

---

[4] 1981 PA 203, effective March 31, 1982.

[5] *Smitter v Thornapple Twp*, 494 Mich 121, 138; 833 NW2d 875 (2013).

[6] There is no dispute that the UAW represented plaintiff at all times during his employment.

3

Between 1990 and 2003, defendant and the UAW negotiated new CBAs at three- or four-year intervals. Each CBA replaced its predecessor and was accompanied by a letter of agreement that replicated the provisions against benefit coordination set forth in the 1990 Letter of Agreement.[7] Things changed, however, in September 2007, when defendant and the UAW agreed to a formula by which defendant would use disability pension benefits to reduce workers' compensation benefits. As a result of this agreement (the 2007 Letter of Agreement), which was simultaneously incorporated into the then-existing 2007 CBA, workers' compensation benefits and disability pension benefits were to be coordinated, but only "for employees who are injured and retire on or after October 1, 2007 . . . ."[8] (Underlining omitted.) In other words, the 2007 Letter of Agreement lifted the prohibition against coordination with respect to future retirees but did not affect those like plaintiff, who had already retired.[9] Like its predecessors, the 2007 Letter of

---

[7] Plaintiff received the benefit of each of these subsequent agreements, even those occurring postretirement.

[8] The 2007 Letter of Agreement explained this new formula in the following terms:

> Pursuant to Subsection 354(14) of the Michigan Workers Compensation Act [MCL 418.354(14)], as amended, until termination or earlier amendment of the 2007 Collective Bargaining Agreement for employees who are injured and retire on or after October 1, 2007, workers' compensation payments for such employees shall be reduced by disability retirement benefits payable under the Hourly-Rate Employees Pension Plan to the extent that the combined workers' compensation payments, initial Social Security Disability Insurance Benefit Amount, and the initial disability retirement benefit (per week) exceed the employee's gross Average Weekly Wage at the time of the injury.

[9] The 2007 Letter of Agreement did not completely coordinate future retirees' benefits. Rather, a retiree's workers' compensation benefits were reduced only "to the extent that" the retiree's workers' compensation payments, SSDI benefits, and disability pension

4

Agreement expressly stipulated that the agreement against coordination would continue "until termination or earlier amendment of the 2007 Collective Bargaining Agreement . . . ."

In 2009, because of the severe economic downturn and defendant's impending bankruptcy, defendant and the UAW revisited their 2007 Letter of Agreement and agreed to amend its terms to encompass a larger pool of retirees. As a result of this agreement (the 2009 Letter of Agreement), which was again simultaneously incorporated into the then-existing 2009 CBA, defendant and the UAW agreed that "*all* retirees who retired prior to January 1, 2010, regardless of their date of retirement or injury" would be subject to benefit coordination consistent with the 2007 formula.[10]

On November 16, 2009, defendant advised plaintiff by letter that effective January 1, 2010, his benefits would be partially reduced pursuant to the formula set forth in the 2007 Letter of Agreement. Given plaintiff's weekly benefit award, his initial SSDI benefit, his disability pension benefit, and his average weekly wage at the time of his

---

benefits collectively exceeded the retiree's average weekly wage at the time of his injury. In such a case, the retiree's workers' compensation benefits would be reduced by the lesser of the disability pension benefits or the amount of the disability pension benefits in excess of the average weekly wage. In short, a retiree who was subject to coordination under the new formula would, at least, still receive payments from defendant equal to his earnings before the injury that resulted in the disability benefits.

[10] Emphasis added. The 2009 Letter of Agreement provided as follows:

> As a result of the 2009 negotiations, the parties have agreed that the 2007 letter agreement, referenced above, will be amended such that, effective January 1, 2010, the provisions of the 2007 letter agreement will be applied to all retirees who retired prior to January 1, 2010, regardless of their date of retirement or injury.

injury, the letter indicated that plaintiff's coordinated weekly workers' compensation rate would be $264.96. Plaintiff received a nearly identical letter on January 19, 2010, the only material difference being that his weekly workers' compensation rate was reduced to $262.55.

Following coordination of his benefits, plaintiff requested a hearing before the director of the Workers' Compensation Agency, who found that defendant was improperly using plaintiff's SSDI benefits to offset his workers' compensation benefits in violation of MCL 418.354(11).[11] A workers' compensation magistrate reversed the director's MCL 418.354(11) ruling but nevertheless concluded that, under *Murphy v City of Pontiac*,[12] defendant was prohibited from reducing plaintiff's workers' compensation benefits by his disability pension benefits because plaintiff had never agreed to coordination and there was no evidence establishing that the UAW had the authority to bargain on behalf of plaintiff following his retirement.

The Michigan Compensation Appellate Commission (MCAC) affirmed the magistrate's ruling on MCL 418.354(11) but reversed the judgment, holding that regardless of the UAW's authority to bind retirees, defendant was permitted to coordinate plaintiff's disability pension benefits under *Murphy.* Alternatively, the MCAC held that coordination was proper because any right plaintiff had to uncoordinated benefits as part of the 1990 Letter of Agreement and the 1990 CBA had expired effective November 15,

---

[11] This provision prohibits the use of SSDI benefits to reduce weekly workers' compensation benefits unless there has been an amendment of the federal Social Security Act.

[12] *Murphy v City of Pontiac*, 221 Mich App 639; 561 NW2d 882 (1997).

1993. After granting plaintiff's application for leave to appeal, the Court of Appeals reversed the decision of the MCAC and remanded the case for further proceedings.[13]

On appeal in this Court, defendant contended that the Court of Appeals erred by denying defendant its right to coordinate benefits because, under the express terms of the 1990 Letter of Agreement and the 1990 CBA, its agreement not to coordinate employees' workers' compensation benefits with their pension disability benefits expired on November 15, 1993. Because the 2009 Letter of Agreement thereafter permitted coordination of those benefits for those "who retired prior to January 1, 2010, regardless of their date of retirement or injury," defendant argued that coordination was proper under MCL 418.354(14).[14]

Plaintiff responded that as a retiree, he is no longer an active member of the UAW and, therefore, is not covered by the 2009 Letter of Agreement in which defendant and the UAW agreed that coordination was permissible. In the absence of any evidence that the UAW possessed the authority to bind plaintiff to agreements occurring after his retirement, plaintiff argued that the prohibition against coordination to which he did agree as part of the 1990 Letter of Agreement and the 1990 CBA remains in effect.[15]

---

[13] *Arbuckle v Gen Motors LLC*, unpublished opinion per curiam of the Court of Appeals, issued February 10, 2015 (Docket No. 310611).

[14] Defendant also argued that the lower tribunals and this Court lack jurisdiction over this case because it involves the interpretation of a CBA and is thus completely preempted by federal law. However, for reasons that will be explained in further detail, we have jurisdiction over the instant dispute and, therefore, defendant is not entitled to dismissal for lack of state court jurisdiction.

[15] Plaintiff also claimed that defendant's coordination-of-benefits formula illegally "considered" plaintiff's SSDI benefits to reduce his workers' compensation benefits in

7

In lieu of granting defendant's application for leave to appeal, we ordered oral argument on whether to grant the application or take other action,[16] directing the parties to file supplemental briefs addressing the following two issues: "(1) whether the plaintiff's action is preempted by federal law, and (2) whether the plaintiff's action is governed by state law or federal law."[17]

## II. STANDARD OF REVIEW

Although judicial review of a decision by the MCAC is limited, questions of law in a workers' compensation case, including the proper interpretation of a statute, are reviewed de novo.[18] Interpretation of a collective-bargaining agreement, like interpretation of any other contract,[19] is also a question of law also subject to review de

---

violation of MCL 418.354(11), which, as previously indicated, requires employers to "consider[]" a retiree's SSDI benefits as "payments from funds provided by the employer and to be primary payments on the employer's obligation . . . as old-age benefit payments under the social security act are considered" in MCL 418.354(1)(a), but only if the Social Security Act has been amended in a particular way. In other words, MCL 418.354(11) limits an employer's ability to use, i.e., coordinate, SSDI benefits to satisfy its obligation to pay workers' compensation benefits. Because the parties do not dispute that no such amendment to the Social Security Act has occurred, plaintiff asserted that defendant is statutorily forbidden from coordinating his SSDI benefits.

We decline to consider this question because plaintiff failed to adequately brief and argue the issue in this Court, thereby abandoning it. *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

[16] See MCR 7.305(H)(1).

[17] *Arbuckle v Gen Motors, LLC*, 498 Mich 956 (2015).

[18] *Smitter*, 494 Mich at 129.

[19] *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003).

8

novo.[20] A reviewing court interprets a collective-bargaining agreement "according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy."[21]

## III. ANALYSIS

A threshold question is whether plaintiff's claim of entitlement to uncoordinated workers' compensation benefits is actually a claim under § 301 of the federal Labor Management Relations Act (LMRA)[22] and is, therefore, preempted by federal law. As part of this inquiry, we must determine whether we, as a state court, have jurisdiction to decide the merits of this case and, if so, whether state or federal law controls. In resolving these separate yet interrelated questions, it is helpful to review the relevant principles of federal preemption law.

### A. PREEMPTION, JURISDICTION, AND CHOICE OF LAW

When considering a federal statute's preemptive effect, the United States Supreme Court has instructed that "[t]he purpose of Congress is the ultimate touchstone" in every preemption case.[23] Congress may indicate its preemptive intent in two ways:

---

[20] *Maurer v Joy Technologies, Inc*, 212 F3d 907, 914 (CA 6, 2000).

[21] *M&G Polymers*, 574 US at ___; 135 S Ct at 933.

[22] PL 80-101, § 301; 61 Stat 136, 156; 29 USC § 185(a).

[23] *Retail Clerks Int'l Ass'n v Schermerhorn*, 375 US 96, 103; 84 S Ct 219; 11 L Ed 2d 179 (1963).

"explicitly . . . in a statute's language" or, by implication, through a statute's "structure and purpose."[24] Section 301(a) of the LMRA states, in relevant part:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.[25]

Although this statute does not contain an express preemption clause, the United States Supreme Court has concluded that § 301 impliedly preempts certain state-law causes of action involving labor contracts. The Court has explained that

> § 301 is a potent source of federal labor law, for though state courts have concurrent jurisdiction over controversies involving collective-bargaining agreements, *Charles Dowd Box Co.* v. *Courtney*, 368 U. S. 502 [82 S Ct 519; 7 L Ed 2d 483] (1962), state courts must apply federal law in deciding those claims, *Teamsters* v. *Lucas Flour Co.*, 369 U. S. 95 [82 S Ct 571; 7 L Ed 2d 593] (1962), and indeed any state-law cause of action for violation of collective-bargaining agreements is entirely displaced by federal law under § 301, see *Avco Corp.* v. *Machinists*, 390 U. S. 557 [88 S Ct 1235; 20 L Ed 2d 126] (1968). State law is thus "pre-empted" by § 301 in that only the federal law fashioned by the courts under § 301 governs the interpretation and application of collective-bargaining agreements.[26]

Thus, while § 301 clearly "provides the federal courts with jurisdiction over controversies involving collective-bargaining agreements,"[27] and even allows defendants to remove

---

[24] *Jones v Rath Packing Co*, 430 US 519, 525; 97 S Ct 1305; 51 L Ed 2d 604 (1977).

[25] 29 USC 185(a).

[26] *United Steelworkers of America v Rawson*, 495 US 362, 368; 110 S Ct 1904; 109 L Ed 2d 362 (1990).

[27] *Id*.

10

certain disputes to federal court,[28] it is equally clear that state courts have concurrent jurisdiction over those disputes.[29] Defendant has not attempted to remove this case to federal court; we therefore have jurisdiction regardless of whether plaintiff's claim is properly characterized as a claim under § 301 of the LMRA.

That we have jurisdiction over the instant dispute does not, however, end our threshold inquiry. Although state courts have concurrent jurisdiction over controversies involving collective-bargaining agreements, § 301 preempts state substantive law. "[S]tate courts must apply federal law in deciding those claims" because "only the federal law fashioned by the courts under § 301 governs the interpretation and application of collective-bargaining agreements."[30]

We must, therefore, decide whether this case is properly characterized as a claim subject to the preemptive force of § 301. Preemption under § 301 "occurs when a decision on the state claim 'is inextricably intertwined with consideration of the terms of the labor contract and when application of state law to a dispute "requires the interpretation of a collective bargaining agreement." ' "[31] While "a suit in state court alleging a violation of a provision of a labor contract must be brought under § 301 and be resolved by reference to federal law," other state-law claims could still involve "the

---

[28] *Avco Corp v Aero Lodge No 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 US 557, 560; 88 S Ct 1235; 20 L Ed 2d 126 (1968).

[29] *United Steelworkers*, 495 US at 368.

[30] *Id*.

[31] *Jones v Gen Motors Corp*, 939 F2d 380, 382 (CA 6, 1991) (citations omitted).

11

meaning or scope of a term in a contract suit . . . ."[32] Those claims are likewise preempted by federal labor law.[33]

The United States Court of Appeals for the Sixth Circuit has adopted a two-part test for determining whether § 301 preemption applies. The court first "examine[s] whether proof of the state law claim requires interpretation of collective bargaining agreement terms" and second, "ascertain[s] whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law."[34] If application of this test reveals a right that both arises from state law and does not require contract interpretation, then there is no preemption.[35] However, "if a state-law claim fails *either* of these two requirements, it is preempted by § 301."[36]

In this case, we are faced with a claim framed as enforcement of a right to workers' compensation benefits arising under Michigan's workers' compensation statute. While defendant argues that resolution of the coordination issue requires the interpretation of the 1990 Letter of Agreement and the 1990 CBA, as well as various postretirement changes made to plaintiff's pension plan through collective bargaining,

---

[32] *Allis-Chalmers Corp v Lueck*, 471 US 202, 210; 105 S Ct 1904; 85 L Ed 2d 206 (1985).

[33] *Id*. See also *Jones*, 939 F2d at 384 ("[T]he pre-emptive effect of § 301 applies to state-law claims that do not facially allege a breach of [the CBA].").

[34] *Alongi v Ford Motor Co*, 386 F3d 716, 724 (CA 6, 2004).

[35] *Id*.

[36] *Mattis v Massman*, 355 F3d 902, 906 (CA 6, 2004).

12

plaintiff contends that his claim can be resolved in its entirety by resorting only to the Michigan workers' compensation statutes, the WDCA.

The WDCA provides that an employer's obligation to pay weekly workers' compensation benefits "shall be reduced"[37] by other wage-replacement benefits.[38] Thus, as we have held, "[t]he coordination of benefits is mandatory" under the WDCA, subject to certain limitations.[39] The relevant limitation in this case is found in MCL 418.354(14), which provides as follows:

> This section does not apply to any payments received or to be received under a disability pension plan provided by the same employer, which plan is in existence on March 31, 1982. Any disability pension plan entered into or renewed after March 31, 1982 may provide that the payments under that disability pension plan provided by the employer shall not be coordinated pursuant to this section.

Accordingly, benefits under disability pension plans begun or renewed after March 31, 1982, are subject to coordination by virtue of the statute, but an employer may elect against exercising its right to coordinate benefits, such as when it enters into an employment agreement exempting benefits from coordination.

Consistently with MCL 418.354(14), defendant relies on its 2009 Letter of Agreement with the UAW to permit benefit coordination following the expiration of the 1990 Letter of Agreement. In order to determine whether defendant was authorized to coordinate plaintiff's workers' compensation benefits with his disability pension benefits,

---

[37] MCL 418.354(1).

[38] See MCL 418.354(1)(a) through (f).

[39] *Smitter*, 494 Mich at 138.

then, we must necessarily interpret the 1990 Letter of Agreement and the 1990 CBA as well as the parties' subsequent agreements permitting benefit coordination, which were incorporated into the then-existing CBAs. Because resolution of the underlying coordination claim requires the interpretation of the terms of a collective-bargaining agreement, plaintiff's claim fails the first prong of the Sixth Circuit's preemption test. Plaintiff's claim is, therefore, preempted by § 301.

Plaintiff cannot avoid the preemptive force of § 301 by arguing that only defendant's *defense* of coordination depended on interpretation of the CBA whereas proof of plaintiff's claims does not.[40] Resolution of plaintiff's state-law workers'

---

[40] Plaintiff relies heavily on a federal case involving similarly situated General Motors (GM) disability retirees who challenged the coordination of their workers' compensation and disability pension benefits. See *Savage v Gen Motors*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued September 21, 2010 (Case No. 10-12372). At issue in *Savage* was whether the doctrine of complete preemption would permit the defendant to remove the plaintiffs' claims for uncoordinated workers' compensation benefits to federal court. *Id*. at 3. The Eastern District did not permit removal. The court concluded that defendant had raised the breach of the collective-bargaining agreement as a *defense* to the plaintiffs' primary claims to enforce orders awarding each of them workers' compensation benefits under Michigan's workers' compensation statutes. *Id*. at 4. Accordingly, it granted the plaintiffs' motion to remand the case to state court. The court reasoned:

> [P]roof of Plaintiffs' claim does not require the interpretation of the CBA, nor is Plaintiffs' claim a breach of contract claim in disguise. Plaintiffs are seeking to enforce a right to receive workers' compensation benefits, which is created by state statute, not the CBA. Although GM attempts to characterize Plaintiffs' claim as a "right to non-coordination" under the CBA, Plaintiffs' claim is for benefits under the statute. *Plaintiffs* are not asserting a "right to non-coordination"; rather, *GM* is seeking to justify *its* right to coordinate benefits under the CBA. Accordingly, the court finds that Plaintiffs' state law claims are not preempted by § 301. [*Id*. at 5 (alteration in original).]

14

compensation claim " 'is inextricably intertwined with consideration of the terms of the labor contract' " because application of MCL 418.354(14) to the instant dispute " 'requires the interpretation of [the relevant] collective-bargaining agreement.' "[41] Accordingly, this suit must proceed as a case controlled by federal, rather than state, substantive law and the Court of Appeals erred by failing to recognize that.

## B. APPLICATION OF FEDERAL SUBSTANTIVE LAW

As previously indicated, coordination of benefits under the WDCA is "mandatory."[42]  MCL 418.354(14), however, permits the parties to a collective-bargaining agreement to decline to coordinate an employee's workers' compensation benefits with his or her disability pension benefits.  In this case, plaintiff does not dispute

In this case, defendant has not sought removal to federal court.  Nonetheless, its contention that federal law governs the instant case depends on whether § 301 of the LMRA preempts plaintiff's claim.  We are not bound by the decision of the federal district court, *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004), and plaintiff has not claimed that the federal court's judgment has any preclusive effect.  We respectfully disagree with the federal district court's characterization of the parties' collective-bargaining agreement and the Michigan workers' compensation statutes.

Coordination of benefits is mandatory under the WDCA *unless* a statutorily authorized exception to coordination applies.  *Smitter*, 494 Mich at 138.  MCL 418.354(14) permits, but does not require, employers to forego coordination as the result of a collectively bargained agreement.  Thus, any right plaintiff had to *un*coordinated benefits arose exclusively as the result of the CBA, not by force of the Michigan statute.  Had there never been a CBA, the WDCA would have required coordination.  Therefore, the workers' compensation order that plaintiff seeks to enforce "itself is a creature wholly begotten by the CBA."  *Jones*, 939 F2d at 383.  Plaintiff's claim is, thus, " 'inextricably intertwined with consideration of the terms of the labor contract' and . . . 'requires the interpretation of a collective-bargaining agreement.' "  *Id*. at 382 (citations omitted).

[41] *Id*. (citations omitted).

[42] *Smitter*, 494 Mich at 138.

15

that the text of the 2009 Letter of Agreement, as incorporated into the then-existing 2009 CBA, permits coordination of those benefits for "all retirees who retired prior to January 1, 2010, regardless of their date of retirement or injury," while the 1990 Letter of Agreement, in effect when plaintiff retired, did not permit such coordination. The issue, then, is which agreement controls.

Central to this determination is whether the 1990 Letter of Agreement provided vested or nonvested benefits to plaintiff. Under federal law, a union may represent and bargain for already-retired employees, but only with respect to *non*vested benefits.[43] By contrast, when an employer explicitly obligates itself to provide vested benefits, that promise is rendered forever unalterable without the retiree's consent.[44] We must, therefore, consider whether the 1990 Letter of Agreement vested a right in plaintiff to uncoordinated benefits that the 2009 Letter of Agreement could not alter.

In *Garbinski v Gen Motors LLC*,[45] the Sixth Circuit considered whether a letter agreement, containing language identical to that at issue here, created a vested right to uncoordinated workers' compensation benefits. Noting that the intent of the parties and the specific language of the CBA at issue control whether a benefit vests, the Sixth

---

[43] See *Allied Chem & Alkali Workers of America v Pittsburgh Plate Glass Co*, 404 US 157, 171 n 11, 181 n 20; 92 S Ct 383; 30 L Ed 2d 341 (1971). See also *Int'l Brotherhood of Electrical Workers v Citizens Telecom Co of California*, 549 F3d 781, 786-788 (CA 9, 2008); *United Steelworkers of America v Canron, Inc*, 580 F2d 77, 80-81 (CA 3, 1978); *Maytag Corp v UAW*, 687 F3d 1076, 1085 (CA 8, 2012); *Pierce v Security Trust Life Ins Co*, 979 F2d 23, 30 (CA 4, 1992); *American Federation of Grain Millers v Int'l Multifoods Corp*, 116 F3d 976, 979 (CA 2, 1997).

[44] *Allied Chem*, 404 US at 181-182 & n 20.

[45] *Garbinski v Gen Motors LLC*, 521 Fed Appx 549, 552-553 (CA 6, 2013).

Circuit held that the right to uncoordinated benefits had not vested because it was subject to an express durational limit.[46]  Indeed, as in the agreement before us, "the clause placing limits on the right was in the *very same sentence* as the right it created . . . ."[47]  It, thus, clearly informed persons covered by the agreement that "the right was subject to modification."[48]  The agreement, therefore, did not create vested rights.[49]

*Garbinski*'s persuasive force was only enhanced by the later decision of the United States Supreme Court in *M&G Polymers USA, LLC v Tackett*.[50]  In *M&G Polymers*, the United States Supreme Court disapproved prior Sixth Circuit caselaw, which it characterized as "placing a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements."[51]  Those decisions,[52] the Supreme Court explained, "distort the text of [a collective-bargaining] agreement and conflict with the principle of contract law that the written agreement is presumed to encompass the whole agreement

---

[46] *Id*. at 556-557.

[47] *Id*. at 557.

[48] *Id*.

[49] See *id*. at 556.  See also *Sprague v Gen Motors Corp*, 133 F3d 388, 400-401 (CA 6, 1998) (en banc) (refusing to infer an employer's lifetime commitment to vest healthcare benefits to retirees from silence and ambiguous language in a contract that was not collectively bargained).

[50] *M&G Polymers*, 574 US ___; 135 S Ct 926.

[51] *Id*. at ___; 135 S Ct at 935.

[52] See, e.g., *UAW v Yard-Man, Inc*, 716 F2d 1476 (CA 6, 1983), overruled by *M&G Polymers*, 574 US at ___; 135 S Ct at 937.

17

of the parties."[53]  Indeed, basic principles of contract interpretation instruct that "courts should not construe ambiguous writings to create lifetime promises"[54] and, absent a contrary intent, that " 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.' "[55]  For "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life."[56]

These principles govern here.  Far from being "silent as to the duration of retiree benefits," the agreement here clearly extended those benefits only "until termination or

---

[53] *M&G Polymers*, 574 US at ___; 135 S Ct at 936.

[54] *Id*. at ___; 135 S Ct at 936.

[55] *Id*. at ___; 135 S Ct at 937, quoting *Litton Fin Printing Div v NLRB*, 501 US 190, 207; 111 S Ct 2215; 115 L Ed 2d 177 (1991).

[56] *M&G Polymers*, 574 US at ___; 135 S Ct at 937.  See also *Gallo v Moen Inc*, 813 F3d 265, 269, 271 (CA 6, 2016) (stating that "we should not expect to find lifetime commitments in time-limited agreements" and that "[i]f [*M&G Polymers*] tells us anything, however, it is that the use of the future tense without more—without words committing to retain the benefit for life—does not guarantee lifetime benefits"), citing *M&G Polymers*, 574 US at ___; 135 S Ct at 937.  See also *Bland v Fiatallis North America, Inc*, 401 F3d 779, 784 (CA 7, 2005) ("Upon vesting, benefits become forever unalterable, and because employers are not legally required to vest benefits, the intention to vest must be found in 'clear and express language' in plan documents."), citing *Inter-Modal Rail Employees Ass'n v Atchison, T & SF R Co*, 520 US 510, 515; 117 S Ct 1513; 137 L Ed 2d 763 (1997); *Vallone v CNA Fin Corp*, 375 F3d 623, 632 (CA 7, 2004) (stating that "a modification that purports to vest welfare benefits must be contained in the plan documents and must be stated in clear and express language"); *Sengpiel v BF Goodrich Co*, 156 F3d 660, 667 (CA 6, 1998) (stating that the intent to vest must be found in the plan documents and stated in clear and express language); *UAW v Skinner Engine Co*, 188 F3d 130, 139 (CA 3, 1999) (stating that an employer's commitment to vest welfare-plan benefits must not be inferred lightly and must be stated in clear and express language).

earlier amendment of the 1990 Collective Bargaining Agreement," which expired on November 15, 1993. Every agreement subsequent to the 1990 Letter of Agreement, which likewise prohibited coordination, included an express durational limitation identical to that contained in the 1990 Letter of Agreement, representing defendant's continued commitment to refrain from coordinating benefits only "until termination or earlier amendment" of each of those subsequent agreements. By confining plaintiff's right to uncoordinated benefits to a specific period of time, the parties plainly intended to reserve the power to modify the policy regarding coordination at some point in the future. As a result, under the terms of the 1990 Letter of Agreement and the 1990 CBA, plaintiff's right to uncoordinated benefits was subject to modification and was thus a nonvested right.[57] The various letters of agreement that were executed following plaintiff's retirement, together with the express durational clause set forth under the 1990 Letter of Agreement and the 1990 CBA that were in place at the time of plaintiff's retirement, guaranteed that plaintiff would receive uncoordinated benefits only until the

---

[57] Plaintiff also maintains that in order to establish its right to coordination, defendant must provide "clear and unmistakable evidence" that plaintiff intended to waive his state-law right to uncoordinated workers' compensation benefits on the basis of the postretirement amendments of the 1990 CBA. See *Lingle v Norge Div of Magic Chef, Inc*, 486 US 399, 409 n 9; 108 S Ct 1877; 100 L Ed 2d 410 (1988). Plaintiff's reliance on *Lingle* is misplaced. *Lingle* spoke of "clear and unmistakable" evidence as being necessary to overcome an Illinois law prohibiting the parties to a collective bargaining agreement from altering a worker's rights under the state worker's compensation scheme. See *id*. No such law exists in Michigan. Indeed, the only basis for plaintiff's entitlement to uncoordinated workers' compensation benefits was the 1990 Letter of Agreement and the 1990 CBA, which were authorized under MCL 418.354(14) but did not create a vested right to uncoordinated workers' compensation benefits. Accordingly, there was nothing for plaintiff to waive.

agreement terminated or was amended, nothing more.[58]  Because nothing in the 1990

CBA itself, or the subsequent modifications thereto, demonstrates a commitment by

defendant to provide plaintiff an unalterable right to uncoordinated benefits that would

survive termination of the agreement, the Court of Appeals erred by holding that

defendant lacked the authority to coordinate plaintiff's benefits under the 2009 CBA.

## IV.  CONCLUSION

In lieu of granting defendant's application for leave to appeal, we reverse the

judgment of the Court of Appeals and reinstate the MCAC's order allowing defendant to

coordinate plaintiff's workers' compensation benefits with his disability pension benefits.

Neither the 1990 Letter of Agreement along with the 1990 CBA nor any subsequent

agreements created an unalterable right to uncoordinated benefits for life.  They instead

evinced the parties' intent to reserve the power to amend plaintiff's right to

---

[58] The Court of Appeals and plaintiff placed particular emphasis on the deposition testimony of Elizabeth LaMarra, defendant's manager of life insurance and disability plans, who testified that "there is only one pension plan" and further agreed with the statement that "employe[es] that retire under different contracts have different entitlements based on when they retired . . . ."  According to the Court of Appeals and plaintiff, this testimony demonstrates that in the absence of any new agreement with plaintiff explicitly reserving for defendant the right to unilaterally modify the agreement under which plaintiff retired, coordination of plaintiff's benefits was not permissible.

First, this analysis fails to recognize that nonvested rights may be modified absent an unequivocal agreement to the contrary.  Accordingly, that plaintiff was entitled to uncoordinated benefits at his retirement did not indefinitely prohibit defendant from entering into a subsequent agreement permitting benefit coordination when there was no agreement to that effect.  Second, the fact that the attendant letters of agreement modified a single, continuous pension plan has no bearing on the coordination issue because the 1990 Letter of Agreement and the letters of agreement thereafter correspond to the respective CBAs, *not* the pension plan.  Thus, plaintiff's and the Court of Appeals' reliance on this testimony is misplaced.

20

uncoordinated benefits on termination or earlier amendment of the agreements. Under a proper reading of the relevant agreements and the application of federal substantive law, defendant's subsequent coordination of plaintiff's workers' compensation benefits with his disability pension benefits did not violate the terms of plaintiff's disability pension plan, nor did it violate MCL 418.354.

Joan L. Larsen
Robert P. Young, Jr.
Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

21