*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CHARLES KAMINSKI and JOHN MARRA,

        Plaintiffs-Appellees,

v

CITY OF LINCOLN PARK,

        Defendant-Appellant.

UNPUBLISHED
August 25, 2022

No. 357891
Wayne Circuit Court
LC No. 20-013442-CB

Before: JANSEN, P.J., and O'BRIEN and HOOD, JJ.

PER CURIAM.

Defendant, the City of Lincoln Park (Lincoln Park), appeals by leave granted[1] the trial court's order denying its motion for summary disposition. The questions on appeal are whether (1) under *Kendzierski v Macomb Co*, 503 Mich 296; 931 NW2d 604 (2019), the general durational clause of a collective-bargaining agreement (CBA) governs the period over which the retirement healthcare benefits sought by plaintiffs, Charles Kaminski and John Marra, lasted; and (2) the trial court erroneously found that a latent ambiguity in the general durational clause precluded summary disposition. We reverse and remand.

## I. BACKGROUND

This case arises out of plaintiffs' acceptance of early retirements from the Lincoln Park Police Department. Plaintiffs were police officers in the Lincoln Park Police Department, and each served for over 25 years. They were members of the union that represented the Police Department's sergeants and lieutenants, the Lincoln Park Police Command Officers Association (the union).

---

[1] *Kaminski v Lincoln Park*, unpublished order of the Court of Appeals, entered September 13, 2021 (Docket No. 357891).

Facing budgetary concerns, Lincoln Park initiated an early retirement plan, where employees with 18 years of service or more could choose to retire early, on or before January 1, 2005, to offset costs and prevent layoffs. This early retirement plan was an amendment to the CBA in effect at the time of plaintiffs' retirement, the 2002 CBA. The 2002 CBA was valid from July 1, 2002, until June 30, 2007. The 2002 CBA provided for medical insurance, and contained a general durational clause:

## ARTICLE XIII – FRINGE BENEFITS

### Section 1 – Medical Insurance

(a) The City shall provide for all members and eligible dependents of a member's family, the following insurance coverage:

Blue Cross/Blue Shield MVF-1 with convalescent care rider, Master Medical Option I, Medical First Aid Rider with Reciprocity Agreement and Reasonable and Customary cost for Doctor Fees (FAE-VST-RC). Prescription coverage shall be through Pharmacare with coverage and benefits equal to that provided by Blue Cross Blue Shield. Prescriptions shall have a $5.00 co-payment for generic prescriptions and $10.00 co-payment for non-generic prescriptions. Effective 7/1/05, the drug co-payment shall be increased to $10/$20/$30 by contract. The City shall revert back to a drug rider through BCBS if Pharmacare is no longer available, to avoid any lapse of coverage.

\* \* \*

(e) Members retiring from the bargaining unit shall receive the Blue Cross/Blue Shield plan in effect at the time of retirement.

\* \* \*

## ARTICLE XXXX – DURATION

This agreement shall be effective and shall remain in force from the 1st day of July 2002, until the 30th day of June, 2007, and thereinafter until amended or modified as provided herein.

Either party may, on or after March 1, 2007, serve a notice upon the other party of its desire to amend or modify this Agreement, effective July 1, 2007. In such event, the parties shall commence negotiations immediately on such proposed amendments for a succeeding contract.

The early retirement plan stated:

**<u>Voluntary Reduction in Force</u>**

The City proposes to amend the current collective bargaining agreements and pension systems to allow a temporary incentive to encourage a voluntary reduction in work force as follows:

* * *

**B. Incentive:** The proposed incentive program would change the benefit multiplier and grant up to 5 years of service credit to covered members who elect to retire or terminate their employment by January 1, 2005 with a vested benefit at no cost to the member. Members will still be eligible for the three (3) year buy-in in accordance with the applicable Pension Ordinances.

* * *

G. Members retiring under the Early Retirement Program shall receive Blue Cross/Blue Shield MVF-1 Health Insurance with convalescent care rider, master medical option I, medical first aid rider with reciprocity, reasonable and customary costs for doctor's fees.

Prescriptions shall have a $5.00 copayment for generic prescriptions and $10.00 copayment for non-generic prescriptions. Prescription coverage shall be through Pharmacare with coverage and benefits equal to that provided by Blue Cross/Blue Shield.

Plaintiffs were eligible for, and elected, early retirements under the plan. Lincoln Park and the union entered a subsequent CBA, the 2007 CBA, on July 1, 2007, the day after the 2002 CBA was set to expire. The 2007 CBA included a durational clause indicating it was effective between July 1, 2007, and June 30, 2011, "and thereinafter until amended or modified as provided herein."

In July 2014, the state determined Lincoln Park was in a financial emergency under the Local Financial Stability and Choice Act, MCL 141.1541, *et seq.*, and appointed an emergency manager. In April 2015, the emergency manager enacted Order 24, which suspended retirement benefits, instead providing a monthly stipend to retirees. It is uncontested that until the emergency manager issued Order 24, Lincoln Park had continued paying plaintiffs' benefits consistent with the terms of the 2002 CBA and their early retirement agreement. The financial emergency ended in August 2017, and the emergency manager returned financial control of the city to Lincoln Park. After the financial emergency, Lincoln Park continued the monthly stipend rather than reinstating plaintiffs' retirement benefits that existed prior to Order 24.

Plaintiffs filed suit, asserting breach-of-contract, restitution, and specific-performance claims based on Lincoln Park's alleged failure to reinstate plaintiffs' retirement benefits after the emergency ended, breaching the 2002 CBA. In lieu of filing an answer, Lincoln Park moved for summary disposition under MCR 2.116(C)(8). Lincoln Park asserted that plaintiffs' retirement benefits were only part of the larger 2002 CBA, which had a general durational clause limiting the parties' contractual obligations to the period between July 1, 2002, and June 30, 2007. Lincoln Park asserted that there was no specific provision in the 2002 CBA providing a different period for the retirement benefits, and, thus, the general durational clause applied, consistent with *Kendzierski*, 503 Mich at 315. Lincoln Park argued that in 2017, it had no existing duty to plaintiffs

regarding their retirement benefits, and plaintiffs' breach-of-contract and specific performance claims necessarily failed.  Lincoln Park also argued that plaintiffs' restitution claim was simply another breach-of-contract claim, despite their attempts to assert it as a claim for restitution.

Plaintiffs responded, arguing that Lincoln Park impermissibly and unilaterally modified the 2002 CBA in violation of MCL 151.1552(1)(k)(*iv*) because the change to their benefits under emergency management was meant to be temporary.  Plaintiffs asserted *Kendzierski* was distinguishable because they were not claiming their retirement benefits were unalterable, but, rather, that the specific alteration to their benefits was illegal.

Plaintiffs also argued the 2002 CBA's general durational clause contained a latent ambiguity.  Plaintiffs argued the general durational clause's language, providing for additional modification after the termination date, illustrated the parties' intent to have the benefits and obligations under the 2002 CBA extend beyond the termination date.  Plaintiffs asserted the language was subject to multiple interpretations.  According to plaintiffs, this required extrinsic evidence to interpret, making summary disposition under MCR 2.116(C)(8) improper.

Lincoln Park replied, arguing that the subsequent amendment or modification language in the general durational clause was satisfied when the 2007 CBA was enacted.  Lincoln Park argued that, regardless of Order 24 or its subsequent adoption, because plaintiffs did not argue that Lincoln Park lacked authority to modify the 2002 CBA with the 2007 CBA, plaintiffs' breach-of-contract claim failed as a matter of law.  Regarding plaintiffs' ambiguity argument, Lincoln Park argued plaintiffs failed to provide any alternate interpretation or external circumstance, which would render the language ambiguous.

Plaintiffs filed a sur-reply, relying on the common definition of the word "retirement," and arguing that by providing benefits for retirement, the 2002 CBA inherently provided benefits beyond its termination date, through the end of the retirees' retirements.  Plaintiffs also relied on the language in other provisions of the 2002 CBA to argue it extended "beyond the expiration of the singular bargaining period."  Considering these factors, plaintiffs argued, an ambiguity existed regarding the durational period for their retirement benefits.

Lincoln Park filed a sur-reply, arguing that the "thereinafter until amended or modified" language was not ambiguous and was satisfied by the enactment of the 2007 CBA.  Lincoln Park asserted that the language of the 2002 CBA could not create a latent ambiguity, which inherently requires an external circumstance, and instead could only create a patent ambiguity.  Plaintiffs' assertion, Lincoln Park argued, directly conflicted with plaintiffs' earlier argument that the 2002 CBA was facially unambiguous.  Lincoln Park also argued that plaintiffs' reliance on the lay definition of the word "retirement" was an attempt to revive the *Yard-man*[2] inference, that retirement benefits lasted as long as retirement status was maintained.  But, Lincoln Park argued,

---

[2] *Int'l Union, United Auto, Aerospace, & Agricultural Implement Works of America (UAW) v Yard-Man, Inc*, 716 F2d 1476 (CA 6, 1983), abrogated by *M & G Polymers USA, LLC v Tackett*, 574 US 427, 442; 135 S Ct 926; 190 L Ed 2d 809 (2015).

this was improper because the *Yard-Man* inference was explicitly rejected by the United States and Michigan Supreme Courts.

At the hearing on Lincoln Park's motion for summary disposition, Lincoln Park and plaintiffs reiterated their earlier arguments. In denying Lincoln Park's motion, the trial court stated:

> [T]he Court does find that at the very least and minimally there perhaps may be some latently ambiguous language requiring an examination of some extrinsic evidence and thus rendering the (C)(8) in appropriate.
>
> And the parties' intention as to retirement health benefits outlasting create some minimal question of fact requiring a minimal amount of discovery to illuminate.
>
> For those reasons and as more fully put forth in the Plaintiff's [sic] brief the Court is going to deny the motion.

This appeal followed.

## II. STANDARDS OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "MCR 2.116(C)(8) mandates summary disposition if the opposing party has failed to state a claim on which relief can be granted." *Veritas Auto Machinery, LLC v FCA Int'l Operations, LLC*, 335 Mich App 602, 607; 968 NW2d 1 (2021) (quotation marks and citation omitted). "A motion under MCR 2.116(C)(8) tests the legal sufficiency of a claim based on the factual allegations in the complaint." *El-Khalil*, 504 Mich at 159 (emphasis omitted). "When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone." *Id.* at 160. "A motion under MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery." *Id.* "Conclusory statements, unsupported by factual allegations, are insufficient to state a cause of action." *Veritas Auto Machinery*, 335 Mich App at 608 (quotation marks and citation omitted). "Interpretation of a collective-bargaining agreement, like interpretation of any other contract, is also a question of law also subject to review de novo." *Arbuckle v Gen Motors LLC*, 499 Mich 521, 531; 885 NW2d 232 (2016).

## III. GENERAL DURATIONAL CLAUSE

Lincoln Park argues that the trial court's denial of its motion for summary disposition was erroneous because *Kendzierski* controls, the 2002 CBA's general durational clause applies, and, therefore, the provisions providing benefits in the CBA expired when the 2002 CBA expired. We agree.

### A. APPLICABILITY OF GENERAL DURATIONAL CLAUSE

The first question is whether *Kendzierski* controls and, thus, the general durational clause in the 2002 CBA applies. We conclude that it does.

"Our goal in contract interpretation is to give effect to the intent of the parties, to be determined first and foremost by the plain and unambiguous language of the contract itself." *Kendzierski*, 503 Mich at 311 (citation omitted). "If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *Id.* (citation omitted). "However, ambiguity is a finding of last resort[.]" *Id.* (quotation marks and citation omitted). "[W]e will not create ambiguity where the terms of the contract are clear." *Id.* (citation omitted; alteration in original). "[C]ourts cannot simply ignore portions of a contract . . . in order to declare an ambiguity." *Id.* at 312 (citation omitted; alterations in original).

These contract principles apply to CBAs just as they do with regard to any other contract. As this Court has explained:

> The foundational principle of our contract jurisprudence is that parties must be able to rely on their agreements. This principle applies no less strongly to collective bargaining agreements: when parties to a collective bargaining agreement bargain about a subject and memorialize the results of their negotiation in a collective bargaining agreement, they create a set of enforceable rules—a new code of conduct for themselves—on that subject. A party to the collective bargaining agreement has a right to rely on the agreement as the statement of its obligations on any topic covered by the agreement. [*Kendzierski*, 503 Mich at 313 (citation omitted).]

Benefits in CBAs, which do not specify an alternate end date from the rest of the CBA, are governed by the CBA's general durational clause. *Id.* at 315. "If the parties meant to vest health care benefits for life, they easily could have said so in the text." *Id.* at 308.

The 2002 CBA's general durational clause states that the agreement is "effective and shall remain in force" from July 1, 2002, until June 30, 2007, "and thereinafter until amended or modified as provided herein." There is, however, no specific alternate end date for the medical benefits provided. Thus, in the absence of other vesting language, the general durational clause controls under *Kendzierski*. See *Kendzierski*, 503 Mich at 315. This conclusion does not end our inquiry, however. The question becomes whether the language of the general durational clause is ambiguous regarding whether plaintiffs' benefits continued beyond the 2002 CBA.

## B. AMBIGUITY IN GENERAL DURATIONAL CLAUSE

Lincoln Park argues that the trial court erroneously relied on plaintiffs' argument that the 2002 CBA's general durational clause was latently ambiguous because plaintiffs never identified a latent ambiguity and, in any event, the existence of a latent ambiguity is insufficient to avoid summary disposition. We agree.

"An ambiguity may either be patent or latent." *Shay v Aldrich*, 487 Mich 648, 667; 790 NW2d 629 (2010) (footnote omitted). Our Supreme Court has held that a court may not use

-6-

extrinsic evidence to identify a patent ambiguity "because a patent ambiguity appears from the face of the document." *Id.* A court may, however, use extrinsic evidence to show that a latent ambiguity exists. *Id.* "A latent ambiguity . . . is one that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." *Kendzierski*, 503 Mich at 317 (citation omitted). "In other words, [a] latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or a choice among two or more possible meanings." *Id.* (quotation marks and citation omitted, alteration in original).

As stated earlier, the 2002 CBA's general durational clause provides that the 2002 CBA— and the benefits it provided—was in effect from July 1, 2002, until June 30, 2007, "and thereinafter until amended or modified as provided herein." Lincoln Park argues that this language constitutes status-quo language that is consistent with MCL 423.215b(1)[3] and does not extend the benefits provided by the 2002 CBA beyond that agreement's end date in the general durational clause. Lincoln Park also argues that plaintiffs failed to identify a latent ambiguity below and, thus, the trial court's reliance on plaintiffs' arguments on this point was erroneous.

The trial court erred in finding an ambiguity in the language of the 2002 CBA's general durational clause for three reasons. First, the trial court did not identify the ambiguity in the contract. At the hearing on Lincoln Park's motion for summary disposition, the trial court stated "there perhaps may be some latently ambiguous language requiring an examination of some extrinsic evidence" and, thus, summary disposition was inappropriate. The trial court did not specify what rendered the language ambiguous. Although in denying summary disposition the trial court adopted the reasoning in plaintiffs' response below, as Lincoln Park notes, that response does not specify the ambiguity. Second, the trial court did not identify whether the alleged ambiguity was a latent or patent ambiguity. This distinction is critical because extrinsic evidence cannot be used to identify a patent ambiguity. See *Shay*, 487 Mich at 667.

Third, and most importantly, the 2002 CBA contains a general durational clause that is essentially the same as that in *Kendzierski*. The general durational clause in *Kendzierski* states, in two subsections, that (1) the agreement "continue[d] in full force and effect until December 31, 2007" and (2) if neither party gave notice of termination or modification, or that notice was withdrawn before the December 31, 2007 termination date, the agreement would "continue in full

---

[3] Under MCL 423.215b(1), CBAs must provide benefits, even after their expiration, until a new CBA is executed:

> (1) Except as otherwise provided in this section, after the expiration date of a collective bargaining agreement and until a successor collective bargaining agreement is in place, a public employer shall pay and provide wages and benefits at levels and amounts that are no greater than those in effect on the expiration date of the collective bargaining agreement. . . . [MCL 423.215b(1).]

We note that Lincoln Park's reliance on MCL 423.215b(1) is misplaced because the language in this subsection was not in effect at the time the 2002 CBA *or* the 2007 CBA were negotiated and executed. The language in MCL 423.215b(1) was added to 1947 PA 336 by 2011 PA 54, effective June 8, 2011.

force and effect from year to year thereafter, subject to timely notice of termination or modification by either party in subsequent year[s] of an extended Agreement." Here, the general durational clause provides that the agreement is "effective and shall remain in force" from July 1, 2002, until June 30, 2007, "and thereinafter until amended or modified as provided herein." In *Kendzierski*, our Supreme Court held that such a contract is not ambiguous. See *Kendzierski*, 503 Mich at 316-318. The general durational clause at issue here plainly provides that once a new CBA is entered, it functions to end the previous CBA—and the benefits it provided—consistent with *Kendzierski*. *Id.* at 325-326. Thus, the 2002 CBA expired when the 2007 CBA was entered, and plaintiffs were not granted a vested right to lifetime retirement healthcare benefits. Accordingly, the trial court erred by finding that the 2002 CBA's general durational clause was ambiguous and in denying Lincoln Park's dispositive motion.

## IV. WAS THE EMERGENCY MANAGER'S ORDER TEMPORARY?

Plaintiffs assert that the emergency manager's order suspending their retirement healthcare benefits and providing them with a stipend was temporary and when the order was rescinded, the benefits they received from the 2002 CBA should have been reinstated. We agree that the order was temporary and any rights that plaintiffs and Lincoln Park might have had returned to the status that would exist if Order 24 had never been entered.

Under MCL 141.1552(1)(k), the emergency manager could, in relevant part, institute only a temporary rejection, modification, or termination of any condition of an existing CBA. See MCL 141.1552(1)(k)(*iv*). In an April 2015 letter, R. Kevin Clinton, then-State Treasurer, acknowledged having "reviewed [the emergency manager's] determinations" regarding whether the statutory provisions in MCL 141.1552(1)(k) were satisfied, and "agree[d] that all four statutory conditions ha[d] been satisfied." Specifically, Clinton wrote that the "proposed CBA modification will only be effective while the City of Lincoln Park remains in receivership . . . ." When the receivership ended in August 2017, the temporary order modifying plaintiffs' health benefits was no longer in effect and any action taken beyond August 2017 was the result of city action, not that of the emergency manager. At that point, any rights plaintiffs may have had under the CBAs, and any rights Lincoln Park may have had to alter those rights, returned to the status that would have existed had Order 24 never been entered. See *Allen Park Retirees Assoc, Inc v Allen Park*, 329 Mich App 430, 446; 942 NW2d 618 (2019). As we concluded earlier, the 2002 CBA—including plaintiffs' entitlement to retirement healthcare benefits—expired with the adoption of the 2007 CBA. Although Lincoln Park may have continued paying those benefits to plaintiffs well beyond the expiration of the 2002 CBA, under *Kendzierski*, it was under no contractual obligation to do so. It was, therefore, not required to reinstate those benefits once the emergency management ended.[4]

---

[4] To the extent plaintiffs raise a restitution claim, it is abandoned. Although Lincoln Park addressed plaintiffs' restitution claim in its dispositive motion, plaintiffs did not counter those arguments below, and neither party addresses this issue on appeal. See *Davis v City of Detroit Financial Review Team*, 296 Mich App 568, 585-586; 821 NW2d 896 (2012) ("[A] party's failure to properly address the merits of an assertion constitutes abandonment of the issue."). We, therefore, decline to address the restitution issue.

## V. CONCLUSION

For the reasons stated above, we reverse the trial court's decision and remand for entry of an order granting summary disposition in Lincoln Park's favor. We do not retain jurisdiction.

/s/ Kathleen Jansen
/s/ Colleen A. O'Brien
/s/ Noah P. Hood