# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

Reporter of Decisions:
Kathryn L. Loomis

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

KENDZIERSKI v MACOMB COUNTY

Docket No. 156086. Argued on application for leave to appeal November 19, 2018. Decided May 30, 2019.

Rita Kendzierski and others filed a class action in the Macomb Circuit Court against Macomb County, seeking injunctive relief and monetary damages after defendant made changes to retiree healthcare benefits; plaintiffs were retired unionized county employees who had worked for defendant under various collective-bargaining agreements (CBAs) dating back to 1989. Each CBA provided, in materially similar terms, that defendant would provide retirees with specific medical coverage if certain conditions were met and that (1) medical coverage would cease upon the retiree's death or continue for the retiree's spouse after the retiree's death if the retiree had made a spousal election (the surviving-spouse provision), (2) retirees had to enroll in Medicare upon reaching 65 years of age (the supplemental-care provision), and (3) coverage would be temporarily suspended if a retiree became gainfully employed (the subsequent-employment provision). Each CBA also contained a general three-year durational clause—that is, each CBA was in effect for a three-year term. In 2009 and 2010, when the 2008–2010 CBAs were in effect, defendant unilaterally altered plaintiffs' healthcare benefits; plaintiffs claimed that the changes increased the cost of prescription copays, changed deductible amounts, and reduced plan options. The parties filed competing motions for summary disposition regarding whether defendant's changes to the healthcare benefits were allowed under the CBAs, and plaintiffs also requested a permanent injunction enjoining further changes and requiring defendant to return the benefits to the *status quo ante*. The court, Diane M. Druzinski, J., granted defendant's motion in part, concluding that while plaintiffs were entitled to lifetime healthcare benefits under the agreements, defendant could make reasonable modifications to those benefits. The Court of Appeals (FORT HOOD, P.J., and JANSEN and HOEKSTRA, JJ.) affirmed in part and reversed in part, concluding that plaintiffs were entitled to lifetime healthcare benefits but that those benefits could not be modified without plaintiffs' consent. 319 Mich App 278 (2017). The Supreme Court ordered and heard oral argument on whether to grant the city's application for leave to appeal or take other action. 501 Mich 966 (2018).

In an opinion by Justice MARKMAN, joined by Justices ZAHRA, VIVIANO, and CLEMENT, the Supreme Court *held*:

Because the provisions related to retiree healthcare benefits were not ambiguous, extrinsic evidence should not have been reviewed to interpret the CBAs' terms. While a CBA may provide

that certain benefits continue after the agreement's expiration, when a contract is silent regarding the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life. The CBAs at issue here contained a general three-year durational clause, and no provision specified that the disputed benefits were subject to a different duration. Accordingly, the CBAs did not grant plaintiffs a vested right to lifetime and unalterable healthcare benefits, and the promise of retirement healthcare benefits expired at the end of the three-year terms of those agreements.

1. When interpreting a contract, the goal is to give effect to the intent of the parties as determined by the plain and unambiguous language of the contract itself. Unambiguous contract language must be interpreted and enforced as written because an unambiguous contract reflects the parties' intent as a matter of law. However, extrinsic evidence may be submitted to determine the intent of the parties if the contract language is ambiguous. A patent ambiguity arises from the face of the document. A contractual term is ambiguous on its face if the term is equally susceptible to more than a single meaning. A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning but other facts create the necessity for interpretation of a choice among two or more possible meanings. Courts may not create ambiguity when the terms of a contract are clear, and courts cannot ignore portions of a contract to declare an ambiguity. The rule of reasonable expectations, which involves determining what the parties reasonably expected when forming a contract, does not apply when interpreting an unambiguous contract because a policyholder cannot be said to have reasonably expected something different from the clear language of the contract. In this case, the Court of Appeals erred when it referred to the purported ambiguity in the contractual language as a "latent" ambiguity; moreover, the Court of Appeals erred by finding any ambiguity.

2. A CBA is interpreted under principles of contract law, and it is presumed that the written agreement encompasses the whole agreement of the parties. Absent a contrary intent, contractual obligations therefore end when the bargaining agreement terminates. When a contract is silent regarding the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life. Under *M&G Polymers USA, LLC v Tackett*, 574 US ___ (2015), there is also no presumption of vesting based on provisions that: (a) tie eligibility for retirement health benefits to eligibility for a pension, (b) enable continuation of a surviving spouse's healthcare coverage following the death of the retiree, and (c) specify that the employer will pay a retiree's insurance once he or she reaches age 65 when employees could retire at age 55. Accordingly, courts may not infer that the parties likely intended benefits that accrue upon achievement of retiree status to continue as long as the beneficiary remains a retiree; under *CNH Indus NV v Reese*, 583 US ___ (2018), those inferences may not be used to render a CBA ambiguous because such inferences are inconsistent with the ordinary principles of contract law.

3. In this case, none of the CBAs specified that defendant agreed to provide lifetime and unalterable healthcare benefits; if the parties had intended such an outcome, they could have expressed that intent in the agreements, but they did not. The general durational clauses in the CBAs controlled because the CBAs did not specify an alternative ending date for healthcare benefits. In that regard, because the CBAs each contained a three-year durational provision, each CBA guaranteed benefits only until the agreement expired. Moreover, given the provisions indicating that each CBA contained all agreements, express or implied, the most reasonable

interpretation was that the contractual right to retiree healthcare benefits expired when the relevant CBA expired. Contrary to the dissent's argument, the CBAs did not contain a patent ambiguity. The surviving-spouse, supplemental-care, and subsequent-employment provisions did not render the CBAs ambiguous because each of the events addressed in these provisions could occur during the three-year duration of the CBAs. That each of the events could also have occurred beyond the CBAs' durational terms did not support the conclusion that the parties intended coverage to extend in perpetuity. Specifically, the surviving-spouse provision governed the eligibility of the spouse when the retiree died; it did not determine the duration of the retiree's or spouse's benefits. In that way, the surviving-spouse provision did not evidence an intention that the benefits would continue beyond the three-year term specified by the general durational clause. The supplemental-care provision did not guarantee benefits for the duration of the agreement but, instead, conditioned continued benefits on enrollment in Medicare if a retiree reached the age of 65 when the CBA was in effect. The subsequent-employment provision also did not create an ambiguity as to whether the parties intended that retiree benefits would vest; the provision did not necessarily imply that retirees would receive healthcare benefits beyond the three-year durational term because a retiree might alternatively obtain coverage through another employer before the three-year term of the CBA expired. Taken as a whole, the clauses did not reasonably and clearly indicate that the retiree benefits were to continue past the duration of the CBAs. Contrary to the dissent's conclusion, the agreements did not contain provisions that tied benefits to events that could only occur or would almost certainly not occur until after the CBAs expired. Accordingly, the Court of Appeals erred by concluding that although the CBAs did not contain language explicitly promising indefinite benefits, other contract language (the surviving-spouse, supplemental-care, and subsequent-employment provisions) created an ambiguity regarding whether the healthcare benefits were vested. Because the CBAs were not ambiguous with regard to the duration of retiree healthcare benefits, the Court of Appeals erred by concluding that the trial court properly examined extrinsic evidence to determine whether retirees were entitled to lifetime benefits.

Reversed and remanded to the trial court for entry of an order granting summary disposition to defendant.

Chief Justice MCCORMACK, joined by Justice BERNSTEIN, dissenting, agreed with the majority's understanding of the recent federal caselaw but disagreed with the majority's conclusion that the CBAs were unambiguous. When a contract lacks explicit terms on the duration of retiree benefits, implied terms or industry practice may show that the parties intended those benefits to extend beyond the contract's general durational period. For example, ambiguity can arise when a CBA links eligibility for a particular right to an event that would almost certainly occur after the expiration of the agreement. In this case, the surviving-spouse, supplemental-care, and subsequent-employment provisions implied that defendant and the unions intended retiree healthcare benefits to last for those retirees' entire retirements; that is, for their lives. Although those provisions did not irreconcilably conflict with the three-year durational clause, for most employees who retired during a CBA's three-year term, the triggering events were almost certain to occur beyond the expiration of that term. These specific provisions, the nature of the benefits, and the lack of a provision tying the benefits to the general durational clause (unlike in *Reese*) created ambiguity because the CBAs were equally susceptible to being read as promising retirement healthcare for retirement. Because Justice MCCORMACK concluded that the CBAs were ambiguous about whether defendant promised retiree healthcare benefits for more than the three-

year term, she would have remanded the case to the trial court for the fact-finder to determine the duration issue after considering any extrinsic evidence introduced by the parties.

Justice CAVANAGH did not participate in the disposition of this case because the Court considered it before she assumed office.

©2019 State of Michigan

# OPINION

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED  May 30, 2019

STATE OF MICHIGAN

SUPREME COURT

RITA KENDZIERSKI, BONNIE HAINES,
GREG DENNIS, LOUISE BERTOLINI,
JOHN BARKER, JAMES COWAN,
VINCENT POWIERSKI, ROBERT
STANLEY, ALAN MOROSCHAN, and
GAER GUERBER, on Behalf of Themselves
and All Others Similarly Situated,

      Plaintiffs-Appellees,

v                                No. 156086

MACOMB COUNTY,

      Defendant-Appellant.

BEFORE THE ENTIRE BENCH (except CAVANAGH, J.)

MARKMAN, J.

The issue here is whether plaintiffs' collective-bargaining agreements (CBAs) with

defendant, Macomb County, granted plaintiffs a vested right to lifetime and unalterable

retirement healthcare benefits.  The trial court held that while plaintiffs are entitled to

lifetime healthcare benefits, defendant can make reasonable modifications to those benefits. On appeal, the Court of Appeals held that plaintiffs are entitled to lifetime and unalterable healthcare benefits and that such benefits cannot be modified absent plaintiffs' consent. Because we conclude that the CBAs did not grant plaintiffs a vested right to lifetime and unalterable benefits, we reverse the judgment of the Court of Appeals and remand to the Macomb Circuit Court for entry of an order granting summary disposition to defendant consistent with this opinion.

## I. BACKGROUND

This is a class action brought on behalf of approximately 1600 unionized Macomb County employee retirees who worked for defendant under various CBAs dating back to 1989. Plaintiffs claim that in 2009 and 2010 defendant breached these agreements by reducing and altering their healthcare benefits; plaintiffs now seek both monetary damages and injunctive relief. It is undisputed that each CBA contained an express three-year durational provision and that none of the CBAs contained a provision expressly granting a vested right to lifetime and unalterable retirement healthcare benefits. The trial court granted defendant's motion for summary disposition, concluding that while plaintiffs are entitled to lifetime healthcare benefits under the agreements, defendant is permitted to make reasonable modifications to those benefits. The Court of Appeals affirmed in part and reversed in part, concluding that while plaintiffs are entitled to lifetime healthcare benefits, those benefits cannot be modified absent plaintiffs' consent. *Kendzierski v Macomb Co*, 319 Mich App 278, 286-289; 901 NW2d 111 (2017). We ordered and heard

2

oral argument on whether to grant defendant's application for leave to appeal. *Kendzierski v Macomb Co*, 501 Mich 966 (2018).

## II. STANDARDS OF REVIEW

"This Court reviews de novo a trial court's decision on a motion for summary disposition." *Bazzi v Sentinel Ins Co*, 502 Mich 390, 398; 919 NW2d 20 (2018). "This Court also reviews de novo questions of . . . the proper interpretation of a contract." *Id*.

## III. ANALYSIS

It is undisputed that all of the CBAs contain the following provisions or provisions that are "materially similar":[1]

> <u>Retirees</u>: The Employer will provide fully paid Blue Cross/Blue Shield Hospital-Medical coverage to the employee and the employee's spouse, after eight (8) years of service with the Employer, for the employee who leaves employment because of retirement and is eligible for and receives benefits under the Macomb County Employees' Retirement Ordinance . . . .
>
> * * *
>
> Coverage shall be limited to the current spouse of the retiree, at the time of retirement, provided such employee shall retire on or after January 1, 1974. Coverage for the eligible spouse will terminate upon the death of the retiree unless the retiree elects to exercise a retirement option whereby the eligible current spouse receives applicable retirement benefits following the death of the retiree.
>
> Coverage shall be limited to Blue Cross/Blue Shield MVF1 Master Medical with ML Rider, or its substantial equivalence.
>
> * * *

---

[1] At oral argument before this Court, defense counsel indicated that all of the pertinent CBAs contain "similar provisions" and that there is no "dispute as to the nature of the provisions in this case"; plaintiffs' counsel also stated that the CBAs are "materially similar."

3

Retired employees and/or their current spouse, upon reaching age 65, shall apply if eligible, and participate in the Medicare Program at their expense as required by the Federal Insurance Contribution Act, a part of the Social Security Program, at which time the Employer's obligation shall be only to provide "over 65 supplemental" hospital-medical benefit coverage. Failure to participate in the aforementioned Medicare Program, shall be cause for termination of Employer paid coverage of applicable hospital-medical benefits, as outlined herein for employees who retire and/or their current spouse.

Employees who retire under the provisions of the Macomb County Employees' Retirement Ordinance, and/or their current spouse, who subsequently are gainfully employed, shall not be eligible for hospital-medical benefits, during such period of gainful employment . . . .

* * *

The parties acknowledge that during the negotiations which resulted in this Agreement each had the unlimited right and opportunity to make demands and proposals with respect to all subjects of collective bargaining and that all agreements and understandings, expressed, implied, written or oral, are set forth in this Agreement. This Agreement expresses the complete understanding of the Parties on the subject of wages, working conditions, hours of work, benefits and conditions of employment.

* * *

This Agreement shall continue in full force and effect until December 31, 2007. [Paragraph lettering omitted.]

The issue is whether the CBAs granted plaintiffs vested rights to lifetime and unalterable retirement healthcare benefits. In *Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America (UAW) v Yard-Man, Inc*, 716 F2d 1476, 1478 (CA 6, 1983), the United States Court of Appeals for the Sixth Circuit held that the CBAs at issue in that case granted the plaintiffs vested rights to lifetime and unalterable retirement healthcare benefits. However, as recognized by *Arbuckle v Gen Motors LLC*, 499 Mich 521; 885 NW2d 232 (2016), the United States Supreme Court in *M & G Polymers USA,*

*LLC v Tackett*, 574 US ___; 135 S Ct 926; 190 L Ed 2d 809 (2015), overruled *Yard-Man*

(and its progeny) in an opinion that

> characterized [*Yard-Man* and its progeny] as "placing a thumb on the scale
> in favor of vested retiree benefits in all collective-bargaining agreements."
> Those decisions, the Supreme Court explained, "distort the text of [a
> collective-bargaining] agreement and conflict with the principle of contract
> law that the written agreement is presumed to encompass the whole
> agreement of the parties." Indeed, basic principles of contract interpretation
> instruct that "courts should not construe ambiguous writings to create
> lifetime promises" and, absent a contrary intent, that "contractual obligations
> will cease, in the ordinary course, upon termination of the bargaining
> agreement." For "when a contract is silent as to the duration of retiree
> benefits, a court may not infer that the parties intended those benefits to vest
> for life." [*Arbuckle*, 499 Mich at 540, quoting *Tackett*, 574 US at ___; 135
> S Ct at 935-937 (quotation marks omitted; second alteration in *Arbuckle*).][2]

*Tackett* specifically rejected many of the same arguments raised by plaintiffs in the instant

case. For example, *Tackett* rejected *Yard-Man*'s presumption that a general durational

clause, which specifies when a contract will expire, states nothing about the vesting of

retiree benefits.[3] *Tackett*, 574 US at ___; 135 S Ct at 937. It also rejected the presumption

---

[2] In *Arbuckle*, 499 Mich at 525, this Court, applying federal law, held that the defendant
was allowed to "coordinate plaintiff's disability pension benefits because the parties'
collective-bargaining agreements and the subsequent modifications thereto did not vest
plaintiff's right to uncoordinated benefits." That is, pursuant to express durational clauses
within the agreements, we held that provisions that prohibited coordination of benefits
terminated when the agreements expired. *Id*. at 541-543.

[3] *Yard-Man*, 716 F2d at 1482-1483, held that given that a general durational clause does
not specifically pertain to the duration of retiree benefits, it is outweighed by other
considerations. Subsequently, *Noe v PolyOne Corp*, 520 F3d 548, 555 (CA 6, 2008),
abrogated by *Tackett*, 574 US ___; 135 S Ct 926, held that "[a]bsent specific durational
language referring to retiree benefits themselves, a general durational clause says nothing
about the vesting of retiree benefits." (Quotation marks and citation omitted; alteration in
*Noe*.)

of vesting based on provisions that: (a) tie eligibility for retirement health benefits to eligibility for a pension, (b) enable continuation of a surviving spouse's healthcare coverage following the death of the retiree, and (c) specify that the employer will pay a retiree's insurance once he or she reaches age 65 when employees could retire at age 55.[4] *Id*. at ___; 135 S Ct at 937.

*Yard-Man*, 716 F2d at 1482, held that "if [employees] forego wages now in expectation of retiree benefits, they would want assurance that once they retire they will continue to receive such benefits"; "[a]s such, it is unlikely that such benefits . . . would be left to the contingencies of future negotiations." It further held that "when . . . parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Id*. *Tackett*, 574 US at ___; 135 S Ct at 935, 937, rejected these inferences as "inconsistent with ordinary principles of contract law," explaining that "*Yard-Man*'s assessment of likely behavior in collective bargaining is too speculative and too far removed from the context of any particular contract to be useful in discerning the parties' intention" and that the *Yard-Man* Court "derived its assessment of likely behavior not from record evidence, but instead from its own suppositions about the intentions of employees, unions, and employers negotiating retiree benefits." Furthermore, *Tackett* held that *Yard-Man* failed to recognize the traditional principle that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement"[5] and that while "a

---

[4] *Tackett* also rejected the argument that retiree healthcare benefits constitute a form of "deferred compensation." *Tackett*, 574 US at ___; 135 S Ct at 936.

[5] See *Litton Fin Printing Div v Nat'l Labor Relations Bd*, 501 US 190, 206; 111 S Ct 2215;

6

collective-bargaining agreement may provide in explicit terms that certain benefits continue after the agreement's expiration[,] . . . when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id*. at ___; 135 S Ct at 937 (quotation marks, citation, and brackets omitted).

Post-*Tackett*, "the Sixth Circuit [in *Reese v CNH Indus NV*, 854 F3d 877, 882-883 (CA 6, 2017),] held that the same *Yard-Man* inferences it once used to presume lifetime vesting can now be used to render a collective-bargaining agreement ambiguous as a matter of law, thus allowing courts to consult extrinsic evidence about lifetime vesting." *CNH Indus NV v Reese*, 583 US ___, ___; 138 S Ct 761, 763; 200 L Ed 2d 1 (2018). The United States Supreme Court characterized this new analysis as "*Yard-Man* re-born, re-built, and re-purposed for new adventures" and again reversed. *Id*. at ___; 138 S Ct at 763 (quotation marks and citation omitted). It held that the *Yard-Man* inferences could not be used to render a CBA ambiguous. *Id*. at ___; 138 S Ct at 763. Finally, the Supreme Court held that the CBA at issue was unambiguous and that it did not create lifetime healthcare benefits for retirees. *Id*. at ___; 138 S Ct at 766. It observed:

> Tellingly, no other Court of Appeals would find ambiguity in these circumstances. When a collective-bargaining agreement is merely silent on the question of vesting, other courts would conclude that it does *not* vest benefits for life. Similarly, when an agreement does not specify a duration for health care benefits in particular, other courts would simply apply the general durational clause. And other courts would not find ambiguity from the tying of retiree benefits to pensioner status. . . .
>
> Shorn of *Yard-Man* inferences, this case is straightforward. The 1998 agreement contained a general durational clause that applied to all benefits,

___

115 L Ed 2d 177 (1991) ("[A]n expired contract has by its own terms released all its parties from their respective contractual obligations . . . .").

7

unless the agreement specified otherwise. No provision specified that the health care benefits were subject to a different durational clause. . . . If the parties meant to vest health care benefits for life, they easily could have said so in the text. But they did not. And they specified that their agreement "dispose[d] of any and all bargaining issues" between them. Thus, the only reasonable interpretation of the 1998 agreement is that the health care benefits expired when the collective-bargaining agreement expired in May 2004. "When the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further." [*Id*. at ___; 138 S Ct at 766 (citations omitted; alteration in *Reese*).][6]

The Court of Appeals in the instant case did exactly what the Sixth Circuit did in

*Reese*, i.e., it relied on the *Yard-Man* inferences to find the CBAs ambiguous and then

resorted to extrinsic evidence to find in favor of lifetime healthcare benefits.[7] Although

_____

[6] In *Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America v Kelsey-Hayes Co*, 854 F3d 862, 868-871 (CA 6, 2017), the Sixth Circuit held that the CBA at issue in that case was also "ambiguous" regarding retiree healthcare benefits and that the extrinsic evidence indicated that the parties intended the CBA to provide lifetime healthcare benefits. However, the United States Supreme Court vacated the Sixth Circuit's decision and remanded the case for reconsideration in light of its decision in *Reese*. *Kelsey-Hayes Co v Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America*, 583 US ___; 138 S Ct 1166; 200 L Ed 2d 313 (2018).

[7] The dissent distinguishes *Tackett* on the ground that *Tackett* "did not address whether there was ambiguity in the parties' CBA . . . ." However, *Reese*, 583 US at ___; 138 S Ct at 763, expressly held that "the same *Yard-Man* inferences . . . once used to presume lifetime vesting [until rejected by *Tackett* cannot] now be used to render a collective-bargaining agreement ambiguous . . . about lifetime vesting." That is, *Reese* very clearly held that the reasoning in *Tackett* applies equally when the question is whether a CBA is ambiguous about lifetime vesting.

The dissent also asserts that *Reese* is distinguishable because the "CBA [in *Reese*] differed from those here in one important respect that mattered to the Court's analysis: it included language that specifically tied the promise of retiree healthcare to the agreement's general durational clause." We respectfully disagree. In *Reese*, a group benefit plan was incorporated into the CBA by language providing that the group benefit plan " 'will run concurrently with this Agreement and is hereby made a part of this Agreement.' " *Reese v CNH Indus NV*, 854 F3d 877, 889 (CA 6, 2017) (emphasis omitted), rev'd 583 US ___.

8

Because the group benefit plan was a separate agreement from the CBA, this language was necessary to incorporate the group benefit plan into the CBA and to indicate that it would be subject to the same durational provision of the CBA. Furthermore, although *Reese* referred to this provision, it was by no means viewed by the Court as dispositive as evidenced by its single reference to this language in its analysis (as compared to the dissent's five references to such language or the lack of such language in its analysis). Instead, *Reese* held that the CBA "contained a general durational clause that applied to all benefits, unless the agreement specified otherwise," which it did not. *Reese*, 583 US at ___; 138 S Ct at 766. As both *Tackett* and *Reese* held, " 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.' " *Id*. at ___; 138 S Ct at 763, quoting *Tackett*, 574 US at ___; 135 S Ct at 937 (quotation marks and citation omitted). Accordingly, "when an agreement does not specify a duration for health care benefits in particular, . . . courts [should] simply apply the general durational clause." *Reese*, 583 US at ___; 138 S Ct at 766. This is true regardless of whether there is a provision specifically tying the contractual obligation to the general durational clause because "[a]bsent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to *every* term in the CBA: 'until this agreement ends.' " *Gallo v Moen Inc*, 813 F3d 265, 269 (CA 6, 2016), cert den 580 US ___ (2016) (emphasis added). See also *Cooper v Honeywell Int'l, Inc*, 884 F3d 612, 618 (CA 6, 2018) ("[A] general durational clause should be 'applied to *all* benefits, unless the agreement specified otherwise.' ") (emphasis added), quoting *Reese*, 583 US at ___; 138 S Ct at 766; *Cole v Meritor, Inc*, 855 F3d 695, 701 (CA 6, 2017) (" 'In the absence of specific language in the retiree healthcare provisions, the general durational clause controls.' "), quoting *Gallo*, 813 F3d at 272.

Indeed, *Tackett*, 574 US at ___; 135 S Ct at 936, criticized Sixth Circuit decisions that, as with the dissent here, "refused to apply general durational clauses to provisions governing retiree benefits" and instead "requir[ed] a contract to include a specific durational clause for retiree health care benefits to prevent vesting," i.e., to counter the inference that "retiree benefits generally last as long as the recipient remains a retiree . . . ." Similarly, the dissent here chooses not to apply general durational clauses to provisions governing retiree benefits and instead would obligate the CBAs to include affirmative "language *explicitly* linking the providing of retiree healthcare benefits to the CBA's durational clause" in order to prevent vesting, i.e., in order to counter the inference that "*retirement* healthcare was a promise that they would have healthcare for the period of their *retirement*." The Sixth Circuit in *Yard-Man*, 716 F2d at 1482, relied on that same inference: "when . . . parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree," and *Tackett* rejected this reasoning. As *Tackett* explained, such an analysis "distort[s] the text of the agreement and conflict[s] with the principle of contract law that the written agreement is presumed to encompass the whole

this Court is not bound to follow the United States Supreme Court's opinion in *Reese*, we choose to follow it because it is fully consistent with Michigan's own principles of contract law.[8]

"Our goal in contract interpretation is to give effect to the intent of the parties, to be determined first and foremost by the plain and unambiguous language of the contract itself." *Wyandotte Electric Supply Co v Electrical Technology Sys, Inc*, 499 Mich 127, 143-144; 881 NW2d 95 (2016). "If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008). "However, if the contractual language is ambiguous, extrinsic evidence can be presented to determine the intent of the parties." *Id*.

"A contractual term is ambiguous on its face only if it is equally susceptible to more than a single meaning." *Barton-Spencer v Farm Bureau Life Ins Co of Mich*, 500 Mich 32, 40; 892 NW2d 794 (2017). In addition, "if two provisions of the same contract

---

agreement of the parties." *Tackett*, 574 US at ___; 135 S Ct at 936.

[8] The parties do not dispute that, unlike in *Arbuckle*, 499 Mich at 532-536, state law controls here, presumably because while *Arbuckle* involved the interpretation of CBAs with a private employer, the instant case involves the interpretation of CBAs with a public employer, i.e., a political subdivision of the state. See 29 USC 185(a) (providing that "[s]uits for violation of contracts between an employer and a labor organization" may be brought in federal court); 29 USC 152(2) (excluding from the definition of "employer" in 29 USC 185(a) "any State or political subdivision thereof"); *Jackson Transit Auth v Local Div 1285, Amalgamated Transit Union, AFL-CIO-CLC*, 457 US 15, 23; 102 S Ct 2202; 72 L Ed 2d 639 (1982) ("[L]abor relations between local governments and their employees are the subject of a longstanding statutory exemption from the National Labor Relations Act.").

irreconcilably conflict with each other, the language of the contract is ambiguous." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 NW2d 447 (2003).[9]  However, "ambiguity is a finding of last resort . . . ." *Mayor of the City of Lansing v Pub Serv Comm*, 470 Mich 154, 165 n 6; 680 NW2d 840 (2004).  That is, "a finding of ambiguity is to be reached only after all other conventional means of interpretation have been applied and found wanting." *Id*. at 165 (quotation marks, citation, and brackets omitted).  "[W]e will not create ambiguity where the terms of the contract are clear." *Frankenmuth Mut Ins Co v Masters*, 460 Mich 105, 111; 595 NW2d 832 (1999).  "[C]ourts cannot simply ignore portions of a contract . . . in order to declare an ambiguity." *Klapp*, 468 Mich at 467.

"A fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written*." *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005).  "Courts enforce contracts according to their unambiguous terms because doing so respects the freedom of individuals freely to arrange their affairs via contract." *Id*.  "The general rule of contracts is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in courts." *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002) (quotation marks, citation, and brackets omitted).  "When a court abrogates unambiguous contractual provisions based on its own independent assessment of 'reasonableness,' the court undermines the parties' freedom of contract." *Rory*, 473 Mich at 468-469.  "This approach, where judges divine the parties' reasonable expectations

---

[9] See *Mayor of the City of Lansing v Pub Serv Comm*, 470 Mich 154, 166; 680 NW2d 840 (2004) ("[A] provision of the law is ambiguous only if it irreconcilably conflicts with another provision or when it is *equally* susceptible to more than a single meaning.") (quotation marks, citation, and brackets omitted).

and then rewrite the contract accordingly, is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy." *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51; 664 NW2d 776 (2003). "[T]he rule of reasonable expectations clearly has no application when interpreting an unambiguous contract because a policyholder cannot be said to have reasonably expected something different from the clear language of the contract." *Id*. at 62.[10]

These contract principles apply to CBAs just as they do with regard to any other contract. As this Court has explained:

> The foundational principle of our contract jurisprudence is that parties must be able to rely on their agreements. This principle applies no less strongly to collective bargaining agreements: when parties to a collective bargaining agreement bargain about a subject and memorialize the results of their negotiation in a collective bargaining agreement, they create a set of enforceable rules—a new code of conduct for themselves—on that subject. A party to the collective bargaining agreement has a right to rely on the agreement as the statement of its obligations on any topic covered by the agreement. [*Macomb Co v AFSCME Council 25*, 494 Mich 65, 80; 833 NW2d 225 (2013) (quotation marks and citations omitted).]

In *Harper Woods Retirees Ass'n v City of Harper Woods*, 312 Mich App 500, 512-513; 879 NW2d 897 (2015), the Court of Appeals "conclude[d] that the [United States]

---

[10] The dissent appears to be relying on the rule of reasonable expectations to discern an ambiguity in the CBAs when it states in several places that plaintiffs "believe[d]," "underst[ood]," and "thought" that they would have healthcare benefits for the rest of their lives. However, what plaintiffs believed, understood, and thought about their healthcare benefits is only relevant to the extent that it is supported by the actual language of the pertinent CBAs. *Wilkie*, 469 Mich at 60 ("[O]ne's alleged 'reasonable expectations' cannot supersede the clear language of a contract.").

Supreme Court's reasoning in *Tackett* is consistent with Michigan's contract jurisprudence regarding CBAs, which applies with equal force in both the public and private sectors." The Court of Appeals rejected the plaintiffs' argument that "their right to the specific healthcare benefits included in their CBAs and contracts continued indefinitely after retirement, regardless of whether the explicit terms of the contracts indicated that the parties intended those benefits to continue after the agreements expired." *Id*. at 511. Instead, "the language governing retiree healthcare benefits [must] indicate[] that the parties intended the same benefits to continue after expiration of the agreements . . . ." *Id*. at 513. If the language does not so indicate, "the benefits terminated after expiration of the agreements, so that defendant was permitted to alter the benefits under future contracts." *Id*.

Post-*Tackett*, the Sixth Circuit addressed this same issue in *Gallo v Moen Inc*, 813 F3d 265 (CA 6, 2016), cert den 580 US ___ (2016), and concluded that the CBAs did not provide lifetime and unalterable healthcare benefits to retirees and dependents.[11] The court observed:

> *First and foremost*, nothing in this or any of the other CBAs says that Moen committed to provide unalterable healthcare benefits to retirees and their spouses for life. That is what matters, and that is where the plaintiffs fall short. *Tackett* directs us to apply ordinary contract principles and not to tilt the inquiry in favor of vesting—a frame of reference that prompts two questions. What is the contract right that the plaintiffs seek to vindicate? And does the contract contain that right? The plaintiffs claim a right to healthcare benefits for life. But the contracts never make that commitment. Yes, Moen offered retirees healthcare benefits. And yes Moen, like many employers, may have wished that business conditions and stable healthcare costs (hope springs eternal) would permit it to provide similar healthcare

---

[11] This Court approvingly cited *Gallo* in *Arbuckle*, 499 Mich at 540 n 56.

13

benefits to retirees throughout retirement. But the question is whether the two parties signed a contract to that effect. Nothing of the sort appears in the collective bargaining agreements.

> *Second*, not only do the CBAs fail to say that Moen committed to provide unalterable healthcare benefits for life to retirees, everything they say about the topic was contained in a *three-year* agreement. If we do not expect to find "elephants in mouseholes" in construing statutes, we should not expect to find lifetime commitments in time-limited agreements. Each of the CBAs made commitments for approximately three-year terms—well short of commitments for life. Present in each CBA, the general durational clause supplied a concrete date of expiration after which either party could terminate the agreement. When a specific provision of the CBA does not include an end date, we refer to the general durational clause to determine that provision's termination. Absent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: "until this agreement ends." Reading the healthcare provisions in conjunction with the general durational clause gives meaning to the phrases "[c]ontinued," "will be provided," "will be covered," and the like. These terms *guarantee* benefits until the agreement expires, nothing more. [*Id*. at 269 (citations omitted).]

The *Gallo* analysis applies equally to the instant case. It is undisputed that none of the CBAs at issue specifies that defendant committed itself to provide lifetime and unalterable healthcare benefits. It is also undisputed that the CBAs contain three-year durational provisions. Therefore, the CBAs guarantee benefits only until the agreements expire and no longer. In other words, because the CBAs do not specify an alternative ending date for healthcare benefits, their general durational clauses control.

The trial court here found that the CBAs are not ambiguous and that "[d]efendant did not promise or otherwise obligate itself under the clear language to provide a certain duration or level of retiree healthcare coverage beyond the term of each CBA." Indeed, it held that "plaintiffs have not pointed to any specific CBA language explicitly conferring lifetime or unalterable healthcare benefits on retirees." Nevertheless, the court held that

14

plaintiffs are entitled to lifetime healthcare benefits because "plaintiffs have proffered unrefuted evidence that defendant has acknowledged that retiree healthcare coverage is a lifetime benefit." Finally, the trial court held that these lifetime benefits are not unalterable because "plaintiffs have not established [that] defendant has unequivocally acknowledged that it is obligated to provide[] unalterable retiree healthcare coverage." The court concluded that while "retirees have lifetime healthcare benefits," defendant "may reasonably modify the scope and level of benefits from those that existed when the retirees retired."

While the trial court correctly held that the CBAs are not ambiguous and that they do not provide for unalterable lifetime healthcare benefits, it nonetheless relied on extrinsic evidence to conclude that plaintiffs are entitled to lifetime benefits that can be reasonably modified. However, since the CBAs are not ambiguous, the trial court should not have considered extrinsic evidence because the "parol evidence rule . . . prohibits the use of extrinsic evidence to interpret unambiguous language within a document." *Shay v Aldrich*, 487 Mich 648, 667; 790 NW2d 629 (2010); see also *In re Smith Trust*, 480 Mich at 24.

Although the Court of Appeals recognized that the "CBAs do not expressly state whether the benefits were promised indefinitely or only for the duration of the CBA," it concluded that "other contract language creates a latent ambiguity regarding whether the healthcare benefits are vested." *Kendzierski*, 319 Mich App at 286. Given this "latent ambiguity," the Court held that the "trial court properly examined extrinsic evidence to determine the meaning of the CBAs" and properly concluded on this basis that the retirees are entitled to lifetime healthcare benefits. *Id*. at 286-287. However, the appellate court

15

held that the trial court erred by holding that these benefits could be modified absent plaintiffs' consent because a party may not unilaterally alter vested rights. *Id*. at 288-289.

Respectfully, the Court of Appeals erred by finding a latent ambiguity. "A latent ambiguity . . . is one that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." *Shay*, 487 Mich at 668 (quotation marks and citation omitted). In other words, "[a] latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or a choice among two or more possible meanings." *Id*. (quotation marks and citations omitted). Here, the Court of Appeals relied on language within the contract itself to find an ambiguity. Therefore, the Court of Appeals actually found a *patent* ambiguity, not a *latent* ambiguity, because the former arises "from the face of the document." *Id*. at 667.[12] Nevertheless, the Court of Appeals erred by finding even a patent ambiguity. As the trial court correctly held, the CBAs here are unambiguous.

---

[12] Both defendant's counsel and plaintiffs' counsel acknowledged at oral argument before this Court that the Court of Appeals misused the term "latent ambiguity." The classic example of a latent ambiguity is found in *Raffles v Wichelhaus*, 2 Hurl & C 906; 159 Eng Rep 375 (1864), in which the parties contracted for a shipment "to arrive ex Peerless" from Bombay, but, unbeknownst to the parties, there were two ships named "Peerless" sailing from Bombay on that day, which created a latent ambiguity with regard to the ship to which the contract referred. Nothing similar occurred in the instant case. In other words, nothing outside the four corners of the CBAs calls into question the meaning of the language used within the four corners of the CBAs. Indeed, that a Macomb County Executive once stated that defendant "provides retiree health benefits to eligible County retirees (and their eligible beneficiaries) for their lifetimes" is not even inconsistent with our conclusion that the *CBAs* do not require defendant to provide benefits to eligible retirees (and beneficiaries) for their lifetimes. Defendant, of course, remains free to provide greater benefits to retirees (and beneficiaries) than those required under the CBAs.

16

The Court of Appeals rested its ambiguity conclusion on three provisions of the CBAs: (a) "the CBAs contain a 'survivor' option permitting continuation of a surviving spouse's healthcare coverage following the death of the retiree," (b) "the CBAs provide that the agreement may be terminated if the retiree fails to enroll in Medicare at age 65," and (c) "the CBAs provide that healthcare coverage is suspended while the retiree has coverage through another employer but then states that coverage through the CBA recommences once the coverage through the other employer ends." *Kendzierski*, 319 Mich App at 286. On the basis of these provisions, the Court of Appeals concluded that the CBAs were ambiguous as to "whether the parties intended for the retiree benefits to vest . . . ." *Id.*

We do not agree that these provisions render the CBAs ambiguous. The first provision relied on by the Court of the Appeals-- the surviving-spouse provision-- reads:

> Coverage shall be limited to the current spouse of the retiree, at the time of retirement, provided such employee shall retire on or after January 1, 1974. Coverage for the eligible spouse will terminate upon the death of the retiree unless the retiree elects to exercise a retirement option whereby the eligible current spouse receives applicable retirement benefits following the death of the retiree.

The Court of Appeals concluded that because the provision "contemplates that coverage will continue until, and even after, the death of the retiree," it "indicates that the parties intended that the healthcare coverage would last beyond the three-year term of the individual CBAs." *Kendzierski*, 319 Mich App at 286. In our judgment, however, the text of the provision does not warrant this conclusion because it only speaks to the disposition of retiree benefits upon the death of the retiree, which could occur within the three-year duration of the CBAs.

17

The United States Court of Appeals for the Seventh Circuit, in considering a similar surviving-spouse provision, stated as follows:

> The retirees argue that the [collective-bargaining insurance agreement] is implicitly extended beyond its three-year term by a clause that provides benefits for surviving spouses until their death or remarriage. This provision, however, refers to the eligibility of individuals to receive benefits under the agreement, not to the *duration of the agreement.* Surviving spouses were eligible to receive benefits only so long as the [collective-bargaining insurance agreement] was in place. [*Cherry v Auburn Gear, Inc*, 441 F3d 476, 483 (CA 7, 2006).][13]

Similarly, the surviving-spouse provision of the CBAs in this case governs the eligibility of the spouse upon the death of the retiree; it does not set the duration of either the retiree's or the spouse's benefits. Therefore, the provision does not evidence an intention that the benefits continue beyond the term provided in the durational clause of the CBAs.[14]

---

[13] Other federal circuits have interpreted surviving-spouse provisions in a similar fashion. See, e.g., *Barton v Constellium Rolled Prod-Ravenswood, LLC*, 851 F3d 349, 357 (CA 4, 2017) ("The pensioned surviving spouses [summary plan description] provision similarly offers the Retirees little help. . . . This language simply defines a category of people *eligible* to receive benefits; it says nothing about the *duration* for which those benefits will last."); *Crown Cork & Seal Co v Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO*, 501 F3d 912, 918 (CA 8, 2007) (concluding that a surviving-spouse provision did not contain "explicit vesting language"); *IUE-CWA v Gen Electric Co*, 745 F Appx 583, 598 (CA 6, 2018) (declining to infer vesting from a surviving-spouse provision). See also *Little Chute Area Sch Dist v Wisconsin Ed Ass'n Council*, 373 Wis 2d 668, 686-687; 2017 WI App 11; 892 NW2d 312 (2017) ("[T]he provision is fully compatible with non-vesting, as survivorship benefits would be available if, for example, an individual retiree died during the term of the relevant CBA, or during a longer period if the parties chose to carry over the survivorship benefit in subsequent CBAs.") (citation omitted).

[14] Plaintiffs direct our attention to *Bidlack v Wheelabrator Corp*, 993 F2d 603 (CA 7, 1993), which relied upon a surviving-spouse provision in finding a contract ambiguous as to whether the parties intended retiree benefits to vest. We are not persuaded by plaintiffs' reliance on *Bidlack* for two reasons. First, the provision at issue in *Bidlack*, at least arguably, contained durational language-- providing that benefits " 'shall be continued for the spouse after the death of the retiree' "-- while the provision at issue in our case does

18

The Court of Appeals' reliance on the provision requiring enrollment in Medicare at age 65 is also unavailing. That provision states:

> Retired employees and/or their current spouse, upon reaching age 65, shall apply if eligible, and participate in the Medicare Program . . . at which time the Employer's obligation shall be only to provide "over 65 supplemental" hospital-medical benefit coverage. Failure to participate in the aforementioned Medicare Program, shall be cause for termination of Employer paid coverage of applicable hospital-medical benefits, as outlined herein for employees who retire and/or their current spouse.

The Court of Appeals reasoned that "[t]his provision again contemplates that the coverage outlasts the three-year period of the CBA given that a retiree may retire years before turning 65." *Kendzierski*, 319 Mich App at 286. But the Sixth Circuit in *Serafino v City of Hamtramck*, 707 F Appx 345 (CA 6, 2017), considered and rejected a similar argument.[15] The provision at issue in that case stated that the employer would pay retirees' medical expenses " 'until that retired employee attains the age of sixty-five (65) or is eligible for Medicare or Medicaid.' " *Id*. at 348. The Sixth Circuit concluded that rather than indicating any intention that the retiree benefits vest, the provision served only to " 'guarantee[] benefits until the agreement expires, nothing more.' " *Id*. at 352 (emphasis omitted), quoting *Gallo*, 813 F3d at 269. The provision at issue here, by contrast, does not

---

not. *Id*. at 605. Second, *Bidlack* was decided before *Tackett* and *Reese*, and its ambiguity analysis stands in tension with *Reese*. Compare *Bidlack*, 993 F2d at 608 ("[T]he agreements are not silent on the issue [of vesting]; they are merely vague."), with *Reese*, 583 US at ___; 138 S Ct at 766 ("No provision specified that the health care benefits were subject to a different durational clause.").

[15] While *Serafino* is unpublished, the Sixth Circuit later reaffirmed its analysis in *Cooper*, 884 F3d at 618-619, recognizing that *Reese* confirmed that the Sixth Circuit's reasoning in *Serafino* was correct.

contain even a guarantee of benefits for the duration of the agreement but, rather, conditions continued benefits upon enrollment in Medicare if a retiree reaches age 65 within the duration of the CBA.[16] We are not persuaded that this provision demonstrates that benefits will necessarily outlast the expiration of the CBA itself.

Finally, we also do not find that the subsequent-employment provision creates an ambiguity as to whether the parties intended that retiree benefits would vest. It states:

> Employees who retire under the provisions of the Macomb County Employees' Retirement Ordinance, and/or their current spouse, who subsequently are gainfully employed, shall not be eligible for hospital-medical benefits, during such period of gainful employment . . . .

The Court of Appeals identified in this provision an implication "that the retirees will receive healthcare benefits far beyond the three-year term of the CBAs." *Kendzierski*, 319 Mich App at 286. This is not a necessary implication, however, because a retiree might alternatively obtain coverage through another employer before the three-year term of the CBA expires. Moreover, as explained in *Reese*, we are not engaged here in a search for any implication that benefits continue past the expiration of the CBA itself but, rather, are seeking provisions that, taken as a whole, reasonably and clearly indicate that the retiree

---

[16] For this reason, *Matthews v Chicago Transit Auth*, 2016 IL 117638, ¶¶ 83-84; 51 NE3d 753 (2016), upon which plaintiffs rely, is also distinguishable. The Illinois Supreme Court in that case determined that a provision of the CBA stating that the " 'benefit terminates when the retiree attains age 65' " was a "durational provision" and demonstrated the parties' intent that retiree benefits not be "limited by the durational term of the CBA." *Id.* In the instant case, by contrast, the provision at issue indicates that failure to enroll in Medicare "shall be cause for termination" of benefits. Thus, unlike the provision at issue in *Matthews*, the relevant provision here does not supplant the general durational term of the CBA but, instead, sets forth a circumstance wherein retiree benefits will terminate before the expiration of the CBA.

benefits are to continue beyond the duration of the CBAs. *Reese*, 583 US at ___; 138 S Ct

at 766 ("Shorn of *Yard-Man* inferences, this case is straightforward. The 1998 agreement

contained a general durational clause that applied to all benefits, unless the agreement

specified otherwise. No provision specified that the health care benefits were subject to a

different durational clause.").

Contrary to the Court of Appeals' analysis, none of these provisions gives rise to an

ambiguity.[17] Each of the events addressed in these provisions could occur during the three-

---

[17] The dissent relies on the same three provisions and concludes that these "imply that the County and the unions intended that healthcare benefits specific to *retirees* would last for those retirees' entire *retirements*." For the reasons explained earlier in this opinion, we disagree. The dissent also contends that these provisions "differentiate these contracts from those at issue in *Reese*." However, the dissent fails to recognize that these provisions are similar to provisions at issue in *Tackett*; that *Tackett* rejected the Sixth Circuit's conclusion that these provisions "indicate[] an intent to vest retirees with lifetime benefits," *Tackett*, 574 US at ___; 135 S Ct at 933; and that *Reese*, 583 US at ___; 138 S Ct at 765, 763, held that "the inferences that this Court rejected in *Tackett*" cannot be "used to render a collective-bargaining agreement ambiguous . . . ." The dissent also relies on *Alday v Raytheon Co*, 693 F3d 772, 785 (CA 9, 2012), and *Quesenberry v Volvo Trucks North America Retiree Healthcare Benefit Plan*, 651 F3d 437, 441 (CA 4, 2011), for the proposition that an "ambiguity can arise 'where a CBA links eligibility for a particular right "to an event that would almost certainly occur after the expiration of the agreement" . . . [because] such linkage "signals the parties' intent to continue retirement benefits notwithstanding expiration." ' " (Alteration in minority opinion.) However, those cases are significantly distinguishable. The provision at issue in *Alday*, 693 F3d at 783, at least arguably, contained durational language-- " 'the Employer agrees to continue to provide the Comprehensive Medical Plan coverages for which they were covered while active employees, until the retired employee attains age 65' "-- while the provisions at issue in our case do not. Furthermore, the provision at issue in *Quesenberry* tied benefits to an event that was practically certain to occur after the expiration of the CBA-- "[i]t is almost inconceivable . . . that this negotiated mechanism would be triggered during the scope of the 2005 CBA," *Quesenberry*, 651 F3d at 441-- while it is by no means inconceivable that the events addressed in the provisions at issue in our case could take place during the three-year duration of the CBAs. Further, *Alday* and *Quesenberry* were decided before both *Tackett* and *Reese*, and as noted by the *Tackett* Court, "when a contract is silent as to the duration of retiree benefits, a court may *not infer* that the parties intended those benefits to

21

year duration of the CBAs. That each of these events could occur *beyond* that period does not indicate that the parties intended coverage to last beyond the term of the CBAs. Moreover, reading these provisions as encompassing events beyond the duration of the CBAs would obviously give rise to what we view as an altogether unnecessary conflict between these provisions and the general durational provision of the CBAs, when both a more reasonable and a more harmonious understanding can be achieved using the interpretive analysis previously set forth in this opinion. See, e.g., *Singer v Goff*, 334 Mich 163, 168; 54 NW2d 290 (1952) (recognizing "the cardinal principle which requires us to construe this contract as a whole and give harmonious effect, if possible, to each word and phrase"). See also *Barton v Constellium Rolled Prod-Ravenswood, LLC*, 851 F3d 349, 357 (CA 4, 2017) ("One can reconcile the dependent coverage provision with the durational language by reading the former to terminate benefits for a retiree's dependents at the time of the retiree's death, while the benefits for dependents of surviving retirees terminate at

---

vest for life." *Tackett*, 574 US at ___; 135 S Ct at 937 (emphasis added). Finally, contrary to the dissent's contention, we do "leave[] open [the] possibility of ambiguity[.]" For example, if a CBA contained a general durational clause and also a provision, as with the one in *Quesenberry*, that tied benefits to an event that could only occur or would almost certainly not occur until after the expiration of the CBA, that CBA would be ambiguous (at least in the absence of any other provision that might resolve the ambiguity). Accordingly, contrary to the dissent's suggestion, we do not "condition a finding of ambiguity on whether the agreement contained language expressly disclaiming application of the general durational clause to the promise of retiree healthcare," nor do we require "express language in the CBAs providing a different duration for retiree healthcare . . . ." But we *do* require something more than a provision that ties benefits to an event that could *conceivably* occur after the expiration of the CBA in order to counter a general durational clause, and we simply disagree with the dissent's conclusion that the CBAs at issue here contain provisions that tie benefits to events that could only occur or would *almost certainly* not occur until after the expiration of the CBAs.

the end of the CBA. This reading seems the likelier manifestation of the parties' intent, both because it harmonizes the purportedly conflicting provisions and because the dependent coverage sections of the [summary plan description] contain nothing explicit about vesting."). Therefore, simply because these events could occur beyond the duration of the CBAs does not lead us to conclude that the parties intended such coverage to last in perpetuity. Accordingly, these provisions do not render the CBAs ambiguous.[18]

The CBAs contain a general three-year durational clause, and no provision specifies that the benefits in dispute are subject to any different duration. If the parties meant to vest healthcare benefits for life, they easily could have said so in the CBAs, but they did not.[19] The CBAs specify that "all agreements and understandings, expressed, implied, written or oral, are set forth in this Agreement" and that "[t]his Agreement expresses the complete understanding of the Parties on the subject of . . . benefits . . . ." Therefore, the only reasonable interpretation of the CBAs is that the contractual right to healthcare benefits

---

[18] The dissent finds it "odd" that we "interpret[] the agreement as giving benefits for only a short time to any employee who retires near the end of a term, whereas an employee who retires near the beginning of the same CBA would be entitled to nearly three years of those very same benefits." However, that is simply how CBAs with a three-year duration operate. In other words, CBAs, by their nature, regularly expire and are replaced with new CBAs, meaning that both employees who retire and new employees who are hired near the end of the CBA will only be covered by the terms of that CBA until that CBA expires.

[19] That the parties have modified the retiree-benefits provisions of the CBAs over time-- see Defendant's Supplemental Brief, p 16 ("[R]etiree healthcare benefits have been modified with nearly every CBA since 1987"); Exhibit 1 to Plaintiffs' Motion for Summary Disposition (tracking modifications to retiree-benefit provisions since 1989)-- further evidences that the parties did not intend the benefits to be permanent or unalterable. See *Cherry*, 441 F3d at 483 ("[T]he parties' practice of changing the contractual terms in succeeding agreements lends support to [the defendant's] claim that neither party understood the benefits to be permanent or inalterable.").

expired when the CBAs expired.[20] This holding is consistent with our holding in *Arbuckle* that given the durational clauses at issue, the provisions that prohibited the coordination of benefits terminated when the agreements expired.[21] *Arbuckle*, 499 Mich at 541-543. It is also consistent with *Tackett*, which held that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement" and that while "a collective-bargaining agreement may provide in explicit terms that certain benefits continue after the agreement's expiration[,] . . . when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Tackett*, 574 US at ___; 135 S Ct at 937 (quotation marks, citation, and brackets omitted). Because the CBAs at issue here do not indicate that the provided benefits are to continue after the agreement's expiration, this Court will not infer that the parties intended

---

[20] This Court has already held that there is no constitutional right to retiree healthcare benefits, i.e., that such benefits are not " 'accrued financial benefits' " subject to protection from diminishment or impairment by Const 1963, art 9, § 24, and the parties here do not argue to the contrary. See *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 645; 698 NW2d 350 (2005).

[21] We recognize that *Arbuckle* is somewhat distinguishable because in that case the agreements specifically provided that the prohibition against benefit coordination was to continue until the termination or amendment of the agreements, whereas in the instant case the specific provisions pertaining to retiree healthcare benefits are silent regarding their duration. However, as *Gallo*, 813 F3d at 269, correctly recognized, "[w]hen a specific provision of the CBA does not include an end date, we refer to the general durational clause to determine that provision's termination." In other words, "[a]bsent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends.' " *Id*. See also *Gibraltar Sch Dist v Gibraltar MESPA-Transp*, 443 Mich 326, 328; 505 NW2d 214 (1993) ("[A]n agreement to arbitrate does not survive expiration of a collective bargaining contract . . . ."); *Ottawa Co v Jaklinski*, 423 Mich 1, 29; 377 NW2d 668 (1985) (opinion by WILLIAMS, C.J.) ("Jaklinski's right to arbitrate her claim that the Sheriff's failure to reappoint her was not for just cause did not survive the expiration of the collective bargaining agreement.").

24

those benefits to vest for life.  Instead, we hold that the contractual obligations provided therein expired when the CBAs expired.

## IV.  CONCLUSION

Because we conclude that the CBAs did not grant plaintiffs a vested right to lifetime and unalterable retirement healthcare benefits, in lieu of granting leave to appeal, we reverse the judgment of the Court of Appeals and remand to the Macomb Circuit Court for entry of an order granting summary disposition to defendant consistent with this opinion.

Stephen J. Markman
Brian K. Zahra
David F. Viviano
Elizabeth T. Clement

25

STATE OF MICHIGAN

SUPREME COURT

RITA KENDZIERSKI, BONNIE HAINES,
GREG DENNIS, LOUISE BERTOLINI,
JOHN BARKER, JAMES COWAN,
VINCENT POWIERSKI, ROBERT
STANLEY, ALAN MOROSCHAN, and
GAER GUERBER, on Behalf of Themselves
and All Others Similarly Situated,

      Plaintiffs-Appellees,

v                                  No. 156086

MACOMB COUNTY,

      Defendant-Appellant.

_____

MCCORMACK, C.J. (*dissenting*).

The majority holds that the defendant, Macomb County (the County), is entitled to summary disposition because the County's contractual promise to provide retiree healthcare benefits does not extend beyond the duration of the County's collective-bargaining agreements (CBAs) with its employee unions. It reasons that the general durational clauses in the CBAs unambiguously govern that promise because the agreements neither include language exempting retiree healthcare benefits from that general period nor explicitly promise healthcare benefits for the retirees' lifetimes.

The plaintiffs, retired County employees, believe the specific promise of retirement healthcare extended beyond the general contract period. Their understanding has commonsense appeal: they thought *retirement* healthcare was a promise that they would

have healthcare for the period of their *retirement*. They cite specific language in the agreements governing retiree healthcare to support their view.

I agree with the majority's understanding of the principles that guide our review of this dispute. But I disagree with its application of those principles to these agreements. Because the CBAs are ambiguous about whether the County promised retiree healthcare benefits for not more than three years, or instead for the full period of plaintiffs' retirements, I would send the question to the fact-finder, who may properly consider extrinsic evidence to resolve it. I respectfully dissent.

## I. BACKGROUND

For nearly three decades, the County has provided healthcare benefits to its retired employees. Those benefits are described in the CBAs that the County entered into with the unions that represented various groups of County employees.[1] To qualify for the benefits, the CBAs require three things: a retiree must (1) satisfy a years-of-service requirement, (2) be separated from employment with the County because of retirement, and (3) be eligible to receive benefits under the County's retirement ordinance. See Part III of the majority opinion.

Each CBA also contained a general, three-year durational provision. The final article of the 2008–2010 CBAs, for example, provided, "This Agreement shall continue in full force and effect until December 31, 2010." The parties agree that earlier CBAs contained either this same durational clause (varying only in end date) or a substantially

---

[1] The County entered into a different CBA with each bargaining unit, but the parties agree that the relevant language in each CBA is "materially similar."

2

similar one. The historical practice was that at the end of every three-year period,[2] the County and the unions would enter into a successive CBA for another three-year term.

Beginning in 2009, in the middle of the 2008–2010 CBAs, the County unilaterally implemented changes in the retirees' healthcare benefits. According to the plaintiffs, these changes resulted in some retirees paying more for prescription copays, changed deductibles, and reduced plan options. The plaintiffs filed this class action on behalf of themselves and a class of about 1,600 retirees, all of whom retired under these CBAs and received retiree healthcare benefits from the County. The plaintiffs believe that the County violated the 2008–2010 CBAs by making the changes unilaterally, without the retirees' consent. The County responded that the benefit changes were consistent with and allowed by the CBAs.

But a more fundamental dispute arose. The plaintiffs sought a permanent injunction requiring the County to continue providing prechange healthcare benefits for the plaintiffs' lifetimes and to prevent the County from changing those benefits. According to the County, however, at no time did any of the CBAs (the 2008–2010 CBAs and their predecessors) provide a retiring employee with healthcare benefits for the retiree's lifetime. Instead, the County contends that the plaintiffs' right to receive healthcare benefits was subject to each CBA's three-year durational clause. Thus, the County argues, none of these plaintiffs had a right to continued healthcare benefits beyond any three-year term, absent a new contractual promise in a successive CBA. Or, put differently, each CBA only guaranteed retirement healthcare for the three-year period it governed. After that, the

---

[2] The first round of CBAs expired on December 31, 1989.

3

retirees had—and have—no right to future healthcare benefits, absent a new contractual promise from the County.

The plaintiffs, on the other hand, believe that the County promised to provide union members who retired during the term of a CBA with specified healthcare benefits for their retirements; that is, for the rest of their lives. They believe the CBAs, and three provisions in them in particular, support their view. Each provision specifically governs retiree healthcare.

One clause provided that coverage would end upon the death of the retiree or, if the retiree made a spousal election, continue for the retiree's spouse after the retiree's death (the survivor clause):

> Coverage shall be limited to the current spouse of the retiree, at the time of retirement, provided such employee shall retire on or after January 1, 1974. Coverage for the eligible spouse will terminate upon the death of the retiree unless the retiree elects to exercise a retirement option whereby the eligible current spouse receives applicable retirement benefits following the death of the retiree.

Another clause required retirees to enroll in federally funded healthcare upon reaching age 65, after which the County's obligation was to provide only supplemental coverage (the supplemental-care clause):

> Retired employees and/or their current spouse, upon reaching age 65, shall apply if eligible, and participate in the Medicare Program at their expense as required by the Federal Insurance Contribution Act, a part of the Social Security Program, at which time the Employer's obligation shall be only to provide "over 65 supplemental" hospital-medical benefit coverage. Failure to participate in the aforementioned Medicare Program, shall be cause for termination of Employer paid coverage of applicable hospital-medical benefits, as outlined herein for employees who retire and/or their current spouse.

4

Finally, the CBAs addressed temporarily suspending the coverage of any retiree who becomes gainfully employed (the subsequent-employment clause):

> Employees who retire under the provisions of the Macomb County Employees' Retirement Ordinance, and/or their current spouse, who subsequently are gainfully employed, shall not be eligible for hospital medical benefits, during such period of gainful employment, as hereinafter defined: Gainful employment is defined as applying to retiree and/or spouse of retiree who are employed subsequent to the employee retirement. If such employment provides hospital-medical coverage for both retiree and spouse, the County is not obligated to provide said coverage unless and until the coverage of either person is terminated. If the coverage is not provided to retiree and spouse, the County will provide hospital-medical coverage for the person not covered. [Paragraph structure omitted.]

## II. AMBIGUITY

The majority agrees with the County. The majority holds that because the CBAs do not expressly provide a separate end date for retiree healthcare benefits, the CBAs' general, three-year durational clauses unambiguously govern these benefits. The majority does not believe that the survivor clause, the supplemental-care clause, or the subsequent-employment clause create ambiguity because those events might occur during the three-year term of the agreement. And seeing no ambiguity, the majority (correctly) disregards the extrinsic evidence, such as the County's issuing of bonds to fund its retiree healthcare obligation and the many statements by County officials and representatives that support the plaintiffs' contention that the County's promise to provide retiree healthcare benefits extends far beyond 2010.

I agree with the majority's understanding of recent federal jurisprudence governing agreements between employers and their retired employees about healthcare benefits. See *M&G Polymers USA, LLC v Tackett*, 574 US ___; 135 S Ct 926, 933; 190 L Ed 2d 809

(2015); *CNH Indus NV v Reese*, 583 US ___; 138 S Ct 761, 766; 200 L Ed 2d 1 (2018). I also agree that this jurisprudence brings the United States Court of Appeals for the Sixth Circuit in line with the principles which govern this Court's contract interpretation.

But I am not convinced that any of those principles compel the result reached by the majority. The question is whether these CBAs are ambiguous. The *Tackett* Court did not address whether there was ambiguity in the parties' CBA; instead, the Court rejected the Sixth Circuit's unique approach to this particular contractual question and remanded the case for the Court "to apply ordinary principles of contract law in the first instance." *Tackett*, 574 US at ___; 135 S Ct at 937. And while the *Reese* Court held that the particular agreement was unambiguous and did not provide for lifetime benefits, that CBA differed from those here in one important respect that mattered to the Court's analysis: it included language that specifically tied the promise of retiree healthcare to the agreement's general durational clause. *Reese*, 583 US at ___; 138 S Ct at 766 (explaining that the CBA provided that "the health benefits plan 'ran concurrently' with the collective-bargaining agreement, tying the health care benefits to the duration of the rest of the agreement") (citation and brackets omitted).

CBAs must be interpreted "according to ordinary principles of contract law . . . ." *Tackett*, 574 US at___; 135 S Ct at 933; see also *Port Huron Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich 309, 327; 550 NW2d 228 (1996) ("A collective bargaining agreement, like any other contract, is the product of informed understanding and mutual assent."). The guiding principle is that "as with any other contract, the parties' intentions control." *Tackett*, 574 US at ___; 135 S Ct at 933 (quotation marks and citation omitted); see also *McIntosh v Groomes*, 227 Mich 215, 218; 198 NW 954 (1924) ("The cardinal rule in the

6

interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate."). When a contract lacks explicit terms on the duration of retiree benefits, "implied terms" or "industry practice" may show the parties intended those benefits to extend beyond the contract's general durational period. *Tackett*, 574 US at ___; 135 S Ct at 937-938 (Ginsburg, J., concurring); see also *Reese*, 583 US at ___; 138 S Ct at 765 (noting that "[t]he Sixth Circuit did not point to any explicit terms, implied terms, or industry practice suggesting that the 1998 agreement vested health care benefits for life") (citation omitted); *Tackett v M&G Polymers USA, LLC*, 811 F3d 204, 209 (CA 6, 2016) ("Thus, while the Supreme Court's decision prevents us from presuming that 'absent specific durational language referring to retiree benefits themselves, a general durational clause *says nothing* about the vesting of retiree benefits,' we also cannot presume that the *absence* of such specific language, by itself, evidences an intent *not* to vest benefits or that a general durational clause says *everything* about the intent to vest.") (citation omitted); *Morley v Auto Club of Mich*, 458 Mich 459, 466; 581 NW2d 237 (1998) ("[W]hat is plainly implied from the language used in a written instrument is as much a part thereof as if it was expressed therein.") (quotation marks and citation omitted). For example, ambiguity can arise "where a CBA links eligibility for a particular right 'to an event that would almost certainly occur after the expiration of the agreement' . . . [because] such linkage 'signals the parties' intent to continue retirement health benefits notwithstanding expiration.' " *Alday v Raytheon Co*, 693 F3d 772, 785 (CA 9, 2012) (brackets omitted), quoting *Quesenberry v Volvo Trucks North America Retiree Healthcare Benefit Plan*, 651 F3d 437, 441 (CA 4, 2011).

7

All of that is to say that a court should not engage in presumptions that favor either the plaintiffs or the County. But the implied terms make this a hard case. Unlike in the CBA at issue in *Reese*, these CBAs did not tie retirement healthcare benefits to the general durational clause. And specific clauses in these CBAs governing eligibility for retirement healthcare imply that the County and the unions intended that healthcare benefits specific to *retirees* would last for those retirees' entire *retirements*.

General principles of contract law lead me to conclude that these contracts are ambiguous, because they are equally susceptible to more than one meaning. *Barton-Spencer v Farm Bureau Life Ins Co of Mich*, 500 Mich 32, 40; 892 NW2d 794 (2017); see also *Hall v Equitable Life Assurance Society of the United States*, 295 Mich 404, 409; 295 NW 204 (1940) (" 'A patent ambiguity is one apparent upon the face of the instrument, arising by reason of inconsistency, obscurity or an inherent uncertainty of the language adopted, such that the effect of the words in the connection used is either to convey no definite meaning or a double one.' "), quoting *Zilwaukee Twp v Saginaw-Bay City R Co*, 213 Mich 61, 69; 181 NW 37 (1921).[3] And because these CBAs are equally susceptible to being read as promising retirement healthcare for retirement, I believe a jury should resolve this question.

In my view, the general durational clause is doing more work for the majority than it should. These CBAs contain no provision that connects the promise of retiree healthcare benefits to the duration of any CBA. Cf. *Reese*, 583 US at ___; 138 S Ct at 766 (explaining

---

[3] I agree with the majority that the ambiguity identified by the Court of Appeals is a patent ambiguity, not a latent ambiguity. See *Shay v Aldrich*, 487 Mich 648, 667-668; 790 NW2d 629 (2010). Because I see patent ambiguity on the face of the CBAs, I don't address latent ambiguity.

that the CBA at issue provided that "the health benefits plan 'ran concurrently' with the collective-bargaining agreement, tying the health care benefits to the duration of the rest of the agreement") (citation and brackets omitted); *Cherry v Auburn Gear, Inc*, 441 F3d 476, 482-483 (CA 7, 2006) (concluding that there was no ambiguity because the CBA provided that the employer's obligation to provide benefits continued " 'during the period of this agreement' "); *Barton v Constellium Rolled Prod-Ravenswood, LLC*, 851 F3d 349, 352-354 (CA 4, 2017) (finding that there was no ambiguity because the CBA provided that retiree health benefits " 'shall remain in effect for the term of this . . . Labor Agreement' "); *Crown Cork & Seal Co, Inc v Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO*, 501 F3d 912, 917-918 (CA 8, 2007) (finding that there was no ambiguity because the CBAs provided that the employer would continue to provide benefits " 'without modification for the life of' " the CBAs).

But the CBAs in this case contain provisions that imply the opposite conclusion. The CBAs' survivor clause, the supplemental-care clause, and the subsequent-employment clause each imply that retirement healthcare is a benefit that generally runs with retirement for life. In my view, these more specific provisions, the nature of the benefit, and the lack of a provision tying the benefits to the general durational clause (unlike in *Reese*) creates ambiguity.

Yes, a retiree can die, become Medicare-eligible, or become re-employed within any given three-year term of a CBA. And, therefore, I agree with the majority that these provisions do not irreconcilably conflict with the three-year durational clause. But an irreconcilable conflict is not the only way a contract can be ambiguous. As this Court stated in *Hall*, 295 Mich at 409, a contract may be ambiguous "by reason of inconsistency,

9

obscurity or an inherent uncertainty of the language adopted, such that the effect of the words in the connection used is either to convey no definite meaning or a double one." (Quotation marks and citation omitted.)  See also *Reese*, 583 US at ___; 138 S Ct at 765 (explaining that a CBA is ambiguous if it is "reasonably susceptible to at least two reasonable but conflicting meanings") (citation and quotation marks omitted).

Each of these provisions supports a reading that the CBAs promise retiree healthcare benefits for retirement (that is, for life) for those employees who become eligible for them during the term of the contract.  For example, the survivor clause says that healthcare benefits for an eligible spouse "will terminate *upon the death of the retiree* unless the retiree elects to exercise a retirement option, whereby the eligible current spouse receives applicable retirement benefits following the death of the retiree."  (Emphasis added.)  This promise continues spousal coverage *until the death of the retiree*, and even beyond that for an indefinite period, if the retiree makes a spousal election.  That is, even if the retiree-spouse dies before the CBA expires, the contractual language implies that the spousal benefits continue beyond any three-year term.

The supplemental-care clause and the subsequent-employment clause similarly support plaintiffs' reading of the CBAs.  While it is possible for the triggering events to happen within the three-year term of a CBA, that durational limitation isn't the most commonsense reading of the language.  The context is *retirement*, after all—that portion of life following work and extending to death.  The parties to the CBAs might have intended the natural reading of the supplemental-care clause: that it offers supplemental coverage once a retiree becomes eligible for Medicare, which, for many employees who retire during a CBA, will be some time beyond that three-year period.  See *Consol Rail*

10

*Corp v R Labor Executives' Ass'n*, 491 US 299, 311; 109 S Ct 2477; 105 L Ed 2d 250 (1989) (stating that practice, usage, and American custom must be considered when interpreting a CBA); *United Steelworkers of America v American Mfg Co*, 363 US 564, 567; 80 S Ct 1343; 4 L Ed 2d 1403 (1960) ("[S]pecial heed should be given to the context in which collective bargaining agreements are negotiated and the purpose which they are intended to serve."). It is at least equally reasonable to conclude that, by "link[ing] eligibility for a particular right 'to an event that would almost certainly occur after the expiration of the agreement'—e.g., turning 65 or becoming eligible for Medicare—such linkage 'signals the parties' intent to continue retirement health benefits notwithstanding expiration.' " *Alday*, 693 F3d at 785, quoting *Quesenberry*, 651 F3d at 441 (brackets omitted).

Understanding the retiree healthcare benefits to apply to *retirement* for those employees who enter that status during the term of the CBA is at least equally reasonable given the context. In my view, the majority's conclusion that the parties must have intended the opposite result—that the general durational clause limits retirement healthcare benefits to three years (or less, depending on when an employee retires)—doesn't account for the CBAs' implied terms, which differentiate these contracts from those at issue in *Reese*.

If these retiree healthcare benefits are guaranteed for no more than three years, then for any single retiring employee the length of the retirement benefit will depend solely on when that employee retires within the three-year period of the CBA. That is, the majority interprets the agreement as giving benefits for only a short time to any employee who retires near the end of a term, whereas an employee who retires near the beginning of the

11

same CBA would be entitled to nearly three years of those very same benefits. It is an odd reading that results in the value of the retirement benefit varying with the arbitrary date of the employee's retirement, rather than years of service or any other factor.

Finally, I respectfully disagree with the majority that my approach to these CBAs is the same approach that the Supreme Court of the United States implicitly rejected in *Tackett* and *Reese*. Neither *Tackett* nor *Reese*—nor our own jurisprudence—compels the result the majority reaches.[4] *Tackett* and *Reese* left open the possibility that a CBA's promise of retiree healthcare might be ambiguous notwithstanding the presence of a general durational clause. Nor did either case condition a finding of ambiguity on whether the agreement contained language expressly disclaiming application of the general durational clause to the promise of retiree healthcare. I assume the Supreme Court left these possibilities open for a reason: there are cases in which, despite a general durational clause, the contractual language is equally susceptible to more than one meaning. I am not convinced that the majority's decision leaves open that possibility of ambiguity; under its framework, it is difficult to imagine under what circumstances a general durational clause

---

[4] The majority concludes that an important difference between these CBAs and the agreement in *Reese*—the existence of language *explicitly* linking the providing of retiree healthcare benefits to the CBA's durational clause—was not "dispositive" to the *Reese* Court's analysis. Maybe not—the opinion doesn't say either way. But it was one of several provisions that the Court cited in concluding that the CBA was not ambiguous, *none of which* the Court proclaimed to be dispositive alone. See *Reese*, 583 US at ___; 138 S Ct at 766. And the CBAs in this case do *not* include any similar language explicitly linking retiree healthcare benefits to the durational clause. That makes these CBAs different, and importantly so.

will *not* control.[5] While it is true that the parties could have included express language in the CBAs providing a different duration for retiree healthcare, that is simply another way of saying that the parties could have written an unambiguous contract.

Given the patent ambiguity, I would reverse that part of the Court of Appeals' judgment remanding the case to the trial court for entry of summary disposition in favor of the plaintiffs, because the meaning of an ambiguous contract is a question that generally must be decided by the trier of fact. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 469; 663 NW2d 447 (2003) ("It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury.").

### III. RELIEF

The plaintiffs have identified extrinsic evidence that they believe suggests that the County promised retiree healthcare for retirement. The County's actuaries issued regular reports, beginning as early as 1993, describing the benefits as an "IOU" (I owe you) to the County's future retirees. The County created a trust specifically for retiree healthcare, which it funded with tens of millions of dollars to satisfy its future obligations. The County issued bonds to fund that trust when it determined that current funding levels would not be

---

[5] The majority acknowledges that ambiguity might be found (notwithstanding a general durational clause) if the CBA "tied benefits to an event that could only occur or would almost certainly not occur until after the expiration of the CBA[.]" Again, I acknowledge that there is no irreconcilable conflict here; events triggering the CBAs' survivor clause, supplemental-care clause, or subsequent-employment clause could occur before expiration of the CBA. But unlike the majority, I don't believe it is only "*conceivabl*[*e*]" that these triggering events would occur beyond the expiration of the CBA. These CBAs permit an employee to retire at age 50 and receive both a pension and retiree healthcare benefits. For most employees who retire during a CBA's three-year-term, the triggering events (death or reaching age 65) are almost certain to occur beyond the expiration of that term.

13

enough to meet its future obligations "for the next 50 years." During labor negotiations, the County's representatives described the retiree healthcare as a "lifetime" benefit. Many retirees tell the same story: that representatives from the County assured them that their healthcare benefits would last their lifetimes. And the County's bargaining history might support the plaintiffs' view: while its position here is that retirement healthcare is only promised for the three years of each CBA, the County has continuously provided it to retirees in every CBA since 1986.[6]

---

[6] The County says that every time it negotiated a CBA, both it and the union understood that the unions only represented the interests of active employees, not retirees. See Defendant's Supplemental Brief, p 16 (stating that "[t]he CBAs since 1986 have been negotiated with the County of Macomb by 23 Unions on behalf 'of regular employees,' generally effective every three years."). This approach is consistent with federal labor law, under which a union does not have to bargain on behalf of retired employees because they are no longer members of the bargaining unit. See *Allied Chem & Alkali Workers v Pittsburgh Plate Glass Co*, 404 US 157, 180; 92 S Ct 383; 30 L Ed 2d 341 (1971) (concluding that the future retirement benefits of *active* workers were subject to mandatory bargaining because those benefits were part of their overall compensation). The Court of Appeals has held the same. See *West Ottawa Ed Ass'n v West Ottawa Pub Sch Bd of Ed*, 126 Mich App 306, 328-330; 337 NW2d 533 (1983).

This leads to an interesting question relating to the County's bargaining history with these unions. If the unions did not have to bargain on behalf of retired employees and the County did not have to continue providing healthcare to them, what are we to make of the fact that the parties continued to negotiate about the terms of retiree healthcare in successive CBAs and that those changes were applied to employees who retired under earlier agreements? On the one hand, the consistent practice of agreeing to new terms for retiree healthcare and applying those new terms to all retired employees (not just those who retired under the current agreement) might suggest that the parties did not believe the benefits lasted beyond the term of the contract. On the other hand, the continued coverage since 1989, even if the County did not have to provide healthcare for the already-retired employees, might be evidence that the County and the unions all believed that retiree healthcare was promised for retirement.

But the County has an explanation for all this evidence: it intends to continue providing such benefits to its retirees, even if it is not contractually obligated to do so. And the County's historical practice of renegotiating retiree healthcare and applying the new terms to past retirees might be evidence that supports its position.

The contracting parties' intent is a disputed question of fact; I believe the Court of Appeals and trial court both erred by determining that, on this record, summary disposition was appropriate. See *Klapp*, 468 Mich at 469. I would remand to the trial court for further proceedings.

## IV. CONCLUSION

I disagree with the majority's conclusion that these CBAs unambiguously limit retiree healthcare to the CBAs' general three-year durational clause. It is just as likely that the parties to these CBAs intended the promised *retirement* benefits to apply to an employees' entire *retirement*. I would conclude that there is ambiguity about the parties' intent, and I would let the fact-finder resolve it with the benefit of the extrinsic evidence from both sides.

I respectfully dissent.

Bridget M. McCormack
Richard H. Bernstein

CAVANAGH, J., did not participate in the disposition of this case because the Court considered it before she assumed office.

15